CORSEARCH, INC., Plaintiff,

v.

THOMSON & THOMSON and Dialog
Information Services, Inc.,
Defendants.

No. 91 Civ. 6706 (RPP).

United States District Court,
S.D. New York.

May 13, 1992.

Keck Mahin Cate & Koether by Mathew E. Hoffman, New York City, Keck, Mahin & Cate by Thomas W. Johnston, Richard L. Reinish, Chicago, Ill., for plaintiff.

Satterlee Stephens Burke & Burke by James F. Rittinger, New York City, for defendants.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT P. PATTERSON, Jr., District Judge.

In this antitrust action instituted on October 4, 1991, Corsearch, Inc. ("Corsearch") seeks an injunction requiring Defendant Thomson & Thomson, Inc. ("T & T") to permit Dialog Information Services, Inc. ("Dialog") to continue to provide T & T's on-line state trademark computer information services to Corsearch, who utilizes these services to provide services to corporations, law firms and others purchasing trademark searches, in competition with similar services offered by T & T to the same market. Corsearch moved for a preliminary injunction, the hearing on which was consolidated with a trial of the action on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Trial was held from November 18, 1991 to December 12, 1991.[1] There have been a number of post trial filings unauthorized by the Court, as well as motions filed by Corsearch on February 5, 1992 to supplement the record, which motion was granted, and to reopen its case, which motion was denied on February 19, 1992. This opinion and order constitutes the findings of fact and conclusions of law of the Court with respect to Counts II, III, IV, and VI of the complaint.[2]

Corsearch's action is based on § 2 of the Sherman Act. It alleges that T & T has monopoly power in the "comprehensive trademark search market" and that T & T terminated Corsearch's right to access to T & T's on-line computer information service, offered by Dialog under the title Trademarkscan–State ("TS–State"), in order to eliminate Corsearch as a competitor. T & T has elected not to terminate Corsearch's access to TS–State while the decision of

---

1. Dialog and Corsearch filed a stipulation of discontinuance prior to trial.

2. The parties agreed in their pre-trial order that Counts I and V of the complaint would be dropped. Tr. 6. The Court ruled that Count VI would not be severed, as it was in the nature of equitable relief. Tr. 8–10. It was further agreed that damages were to be tried separately. Tr. 10.

this Court is pending. TS–State is a copyrighted on-line computer information service product of T & T which is updated at least monthly for use by subscribers to Dialog. It has been offered by Dialog since 1987 pursuant to license agreements with such subscribers and billed at a price based on the amount of computer time utilized by the subscriber and the number of trademark records retrieved by the subscriber. Dialog's revenues are shared with T & T pursuant to a contract between those corporations.

## TRADEMARK SEARCHING

Persons who are intending to adopt a new trademark often wish to determine whether the same or similar trademarks are already in use by others. A trademark used or registered earlier may pose an obstacle to registration with the United States Patent and Trademark Office ("PTO") or with the Secretaries of State of the various states. The adoption of a trademark confusingly similar to an earlier trademark that is currently in use may also, under some circumstances, give rise to a claim for infringement and litigation.

The PTO, which is charged with administering federal registration of trademarks and the maintenance and storage of registrations, is by statute also the agency of record with respect to trademarks and servicemarks. 15 U.S.C. § 1051. The existence of a current file at the PTO for a particular mark constitutes public notice of ownership of the mark and thereby affords the mark's owner a wide range of protection. As of 1983, the trademarks registered with the PTO were prepared and recorded in individual hard copy files.

Searching for earlier trademarks is not an exact science. Prior to filing a trademark registration, applicants often determine to search one or more of the following bodies of information:

(a) *A search of the federal trademarks filed at the United States Patent & Trademark Office.*

(b) *A common law search.* This generally consists of a search of sources such as trade directories, telephone books, Dun & Bradstreet's company

name database, the Thomas Register (a directory of all United States manufacturers of goods), major newspapers, and other current sources. T & T maintains its own common law database of such sources with the permission of the database owners and publishers. With today's technology, many common law searches can be performed through "on-line" computerized information services such as those operated by former Co-defendant Dialog Information Services, Inc.

(c) *A state search.* A state search may consist of reviewing the files of a particular state or a search of all fifty states. All states allow public searching of records by one means or another. In addition to the states' own records, state trademark information is available from private companies such as T & T and Trademark Research Corporation ("TRC") (formerly "Trademark Service Corporation" or "TSC") (a competitor of Corsearch and T & T owned by Commerce Clearing House).

To perform a "comprehensive" or "full" search means to perform all three of these searches for the trademark in question. Sometimes a party planning to adopt a trademark will ask a company such as Corsearch, T & T, or TRC to perform a comprehensive search, but thousands of federal trademark applications are filed each year without ordering a full search from any trademark information service. Instead, law firms, or the applicants themselves, perform searches in many instances where a full search is not ordered from Corsearch, T & T, or TRC. The applicants or law firms may decide to perform a "knockout" search, i.e. a preliminary screening check to eliminate marks. Tr. 71–73 (Altman). Corsearch and T & T combined performed only approximately 60,000 comprehensive searches in 1990, a substantial number of which did not result in trademark applications. 127,000 trademark applications were filed with the PTO in 1990.

## THE GROWTH OF T & T'S DATABASES

T & T, formerly an intellectual property law firm, became dissatisfied many years ago with the quality of government trade-

mark records and began to compile records of its own and to offer trademark research services to others.

Until the early 1970s, T & T maintained its federal trademark database in hard copy, primarily on index cards, and its searches were conducted manually. Manual searching was the method used by the PTO well into the 1980s. By the early 1980s, however, T & T had fully computerized its proprietary federal trademark database and was also utilizing a fully computerized fifty-state trademark database ("NCR–State"), a more complete database than TS–State, for its searches. Trademarkscan, T & T's federal database that went on line in October 1983, contained T & T's record of all active federal registrations and pending applications. It was the first trademark database available on line and permitted the subscriber to do a federal trademark search of Trademarkscan's database without ordering T & T's full federal search at a time when comprehensive searches accounted for eighty-three percent of all T & T's client requests.

## THE COMPUTERIZATION OF THE TRADEMARK SEARCH BUSINESS

Recognizing the need to overhaul the federal registration system, Congress in 1980 enacted legislation requiring the Commissioner of Patents and Trademarks to formulate a plan to identify (or if necessary to develop) feasible computerized data storage and retrieval systems. In separate agreements entered into with the PTO during 1983 and 1984, T & T and two of T & T's then competitors, Compu–Mark SA ("Compu–Mark") and TCR Services, Inc. ("TCR") agreed to provide the PTO with the following:

(a) T & T was to create and develop for the PTO a computerized historic database of all federally registered trademarks as well as all servicemarks consisting of designs or images, or what are commonly known as "logos."

(b) Compu–Mark was to develop for the PTO a computerized database with respect to all active federally registered trademarks and servicemarks registered as of 1980.

(c) TCR was to develop for the PTO a software system that would encompass information "necessary for the PTO's trademark application monitoring system."

On April 11, 1984, T & T acquired TCR, including TCR's obligations to the PTO, for approximately $6 million. As a part of this acquisition of TCR, T & T acquired TCR's state database.

By 1986, the services to be performed by T & T, Compu–Mark, and TCR under the agreements had been substantially performed. Pursuant to the original agreements, the PTO had agreed that, in exchange for T & T, Compu–Mark, and TCR services to the PTO, which were performed without charge, each company would receive for a ten-year period the co-exclusive right to make the federal database available for commercial purposes. This period of exclusivity was first shortened by act of Congress and subsequently terminated by unilateral action of the PTO in approximately the fall of 1989.

In the fall of 1989, after the early termination of T & T's co-exclusive license of the federal database, the entire computerized federal database, prepared by T & T and Compu–Mark, became available for purchase from the PTO by any person or entity for what T & T maintains was a fraction of what it had cost T & T to develop. Corsearch, Mead Data Central, and others then purchased copies of the PTO federal database for utilization in the offering of trademark research services in competition with T & T.

## THE OFFERING OF COMPUTERIZED ON–LINE SERVICE

In 1984, while it was developing the PTO database, T & T entered into a license agreement with former Co-defendant Dialog to sublicense the right to access a federal database (under the tradename "Trademarkscan") by means of a personal computer outfitted with a modem. The parties refer to this as "on-line" access. Shortly thereafter, Compu–Mark, which started operations in the United States in 1983, also offered a direct on-line service for both its federal and state trademark databases. Similarly, in late 1986, T & T announced

the on-line availability of a state trademark database under the tradename "Trademarkscan–State" and began calling its federal on-line database "Trademarkscan–Federal" ("TS–Federal").

In its license agreements with Dialog with respect to TS–Federal and TS–State, T & T required that the following terms and conditions be included in Dialog's sublicense agreements with Dialog's customers:

Data may not be duplicated in hard copy or machine readable form without the prior written authorization from Thomson and Thomson, One Monarch Drive, North Quincy, MA 02171, except that limited reproduction of printed outputs is permitted within the user's internal operation. Under no circumstances may copies produced under this provision be offered for sale or resale.

The last sentence is referred to as the "Resale Limitation" and is included in Corsearch's user agreement with Dialog for both TS–Federal and TS–State. More than sixty of the databases available through Dialog and owned by companies unrelated to T & T impose similar limitations on resale. Def.Exh. UUU.

## T & T'S DEVELOPMENT OF TS–STATE

For many years T & T has obtained trademark information (which may be in hard copy or electronic form) from the fifty states and Puerto Rico on an on-going basis. This data is then compiled, selected, and stored in T & T's internal use database ("M–204"). T & T then selects from the data contained in the internal use database and arranges the selected data in a uniform manner for TS–State so that each TS–State trademark record, from whatever source, presents similar information in the same format. Based upon its years of experience as a trademark search firm, T & T maintains that T & T's own selection and arrangement is particularly appropriate for a computerized trademark database. Where the states' trademark application forms do not call for all of the information that T & T regards as appropriate, T & T has advised the states of the type of data it wishes to collect and has provided forms to the states to facilitate collection of that data. Over the years, T & T has made changes in the items of information from the state trademark registrations that it selects for inclusion in the internal use database and ultimately in the TS–State database. In addition to the selection of data from source documents collected from the states, T & T adds various types of information. For example, T & T adds to each TS–State record a code indicating whether the trademark consists of a word with a design, a word only, or a design only, permitting searches for specific types of marks.

T & T also reviews the description of the goods or services of each state trademark record and adds for TS–State its assessment of the United States and International Class designations, even when the state itself uses no class designations or uses idiosyncratic class designations that differ from the standard United States and International Classes. Even if the state does assign a standard United States or International Class, T & T reviews the description of goods and services and sometimes exercises its own independent discretion to correct the United States and International Classes.

TS–State also includes additional "enhancements" to the data contained in each record in the internal and TS–State databases. Enhancements add to or modify the data so that the search software will be better able to locate and retrieve relevant data. Records for trademarks consisting of words with corrupted spellings (e.g., "Kar Kraft") are supplemented with their proper English equivalents. Foreign words are translated into English. Numerals are given alphabetic equivalents and vice versa. Greek letters are given Latin alphabet equivalents. Puns and slang words (e.g., "skeeter") are given proper English equivalents (e.g., "mosquito").

To enable its internal and TS–State databases of trademark information to be searched by computer, T & T organizes the data in each record into data "fields," each containing a certain type of information, such as name of the mark, date of first use, owner of the mark, or description of the goods. T & T also adds to the record of

each trademark a number of search fields, which organize the information contained in the data fields into discrete units of information. For example, TS–State organizes data concerning the date of registration of a mark into several search fields, one containing the year of registration to permit searching for marks by year, and one containing the year, month, and date of registration to permit searching for marks by specific dates.

Each TS–State record contains numerous fields. A user of the database can search the fields independently or in combinations, which permits the user to obtain, for example, records of all trademarks owned by a particular company or all trademarks first used in December 1989 and registered in Michigan.

T & T also adds "search indices" to each trademark record. Search indices are created from the data contained in certain fields in the record and permit more complete and accurate searching of that record. In the "rotating trademark index," for example, T & T breaks the trademark name into its components—prefix, suffix, embedded letter strings—each of which becomes searchable as a separate element. In order to access all of the data in the various fields, T & T creates an index for each piece of data. The search software responds to the search requests of the internal database user and TS–State database user by sorting through these indexes to pull up corresponding trademark information.

T & T markets the TS–State and TS–Federal on-line services primarily to trademark attorneys as an initial screening device to identify marks that are identical or nearly identical to the mark that the attorney's client is intending to adopt. Becker Aff., ¶ 17. T & T's internal state file contains information not available on Dialog.Pl.Exh. 118. TS–Federal and TS–State are derived from this broader internal database ("M–204"). Tr. 1544 (Becker). T & T believes that Trademarkscan on-line screen-ing searches are best done for such screening or "knock-out" purposes, Becker Aff., ¶ 17, and that a searching organization such as Corsearch that uses Dialog's software produces a report that is inferior to T & T's own in-house reports generated by T & T's proprietary software. For this reason, T & T believes it is inaccurate and misleading for a trademark search company to imply to the public that its search reports, generated by Dialog software, are equivalent to T & T's search reports, generated by T & T's internal software. Becker Aff., ¶ 18.

T & T has always placed a copyright notice on the initial screen that one accesses when signing on to TS–State through Dialog. A similar copyright notice is used for TS–Federal.

## CORSEARCH'S ENTRY INTO TRADEMARK SEARCH BUSINESS

Corsearch is in the business *inter alia* of providing computerized trademark searches for corporations, law firms, and other customers located throughout the United States. Robert M. Frank is the president of Corsearch and has held that position since 1983 when Corsearch was founded under the name Prodata Searches and was incorporated in New York as an information brokerage firm business that specialized in providing general computer research services for small to medium-sized law firms.

At the end of 1983 Corsearch had raised $304,000 in capital, generated revenues of $7400, was left with $46,000 in cash, and had losses of nearly $250,000.

At the end of 1984 Corsearch had combined losses of over $700,000 for the eighteen months it had been in business.

In 1985, shortly after T & T licensed TS–Federal through Dialog, Corsearch began offering trademark searches on federal trademark registrations by accessing TS–Federal through Dialog. Soon thereafter Corsearch began offering a comprehensive trademark search using the on-line state trademark service of Compu–Mark and various on-line services of Dialog for the common law portion of trademark searching.

**T & T'S PERMISSION FOR RESALE BY CORSEARCH**

On June 26, 1985 Mr. Frank wrote to Anthea Gotto of T & T requesting permission for Corsearch to include data from TS–Federal in Corsearch's search reports sold to Corsearch's clients.

On July 18, 1985 Mr. Frank received a letter from Ms. Gotto dated July 16, 1985 granting Corsearch permission to use the results of Trademarkscan–Federal searches in the search reports sold to Corsearch clients. Pl.Exh. 180.

Later in 1985 Corsearch introduced to the market the first same-day service for a fully automated comprehensive computer generated trademark search report.

At the end of 1985 Corsearch had combined losses for the years 1983 through 1985 of over $960,000.

In 1986 Corsearch revenues grew. Corsearch's usage of Dialog increased to $150,000 as compared to total payments of $50,000 in 1985.

In November 1986 T & T announced the release of TS–State on Dialog. Corsearch decided to switch to this new source because it was frustrated with Compu–Mark's billing errors and because the searching software of TS–State was superior to that offered by Compu–Mark.

Corsearch sent a letter dated December 17, 1986 to Ms. Gotto of T & T requesting permission to use the output of TS–State in its trademark search reports. Specifically, Corsearch asked for "permission to (1) search the file, (2) download the results to a diskette, (3) word process the results in order to eliminate useless records, search strategy, etc., and (4) print one copy of the results for the client who ordered the search." Pl.Exh. 182. Corsearch added that "[a]s with all the files we search, we would, of course, maintain the masthead and copyright information supplied through DIALOG." Pl.Exh. 182.

By letter dated January 8, 1987, T & T granted permission to Corsearch to use the output of TS–State, stating:

> Thomson & Thomson is pleased to grant CORSEARCH permission to search the

file and use the results in the manner you described, provided there is due acknowledgement together with the copyright notice.

> We also request that you inform your clients that the TRADEMARKSCAN–STATE database does *not* include corporate name records and that tradenames, assumed names and fictitious names are also not generally included, although they may be identified for some states.

Pl.Exh. 183 (original emphasis).

On September 16, 1987, Corsearch requested that T & T give Corsearch ninety days notice prior to any termination of the permission previously granted by T & T to Corsearch to use the contents of TS–Federal and TS–State in Corsearch's search reports. The request was granted. Def. Exh. L & M; Tr. 544 (Frank).

**THE RELEVANT MARKET**

In the only evidence on the relevant market for purposes of § 2 of the Sherman Act, Corsearch's economist, Dr. Marion Stewart, defined the submarket relevant to Plaintiff's monopoly claims as the market for comprehensive trademark search services in the United States. Dr. Stewart testified that for such services in-house and trademark counsel are "unwilling to rely upon their own internal searches" and that "more sophisticated searches are reserved for marks which have passed knock out tests and are being seriously considered for trademark registration." Stewart Aff., ¶¶ 21–22. Dr. Stewart's finding that corporations and law firms are unwilling to rely on their own searches was one of his principal reasons for limiting the relevant market to firms like TRC, T & T, and Corsearch.[3]

**CORSEARCH'S GAIN OF MARKET SHARE AND COMPETITIVE IMPROVEMENTS**

During 1987 and 1988, Corsearch offered a series of competitive improvements and gained market share of the comprehensive trademark search market as its client base grew.

Corsearch was the first to implement the following improvements to trade mark

---

**3.** It must be recognized, however, that the statistics on applications for trademarks indicate that corporations and law firms *are* filing tens of thousands of applications for trademark without using TRC, T & T, or Corsearch to perform their searches. In 1990 Corsearch accounted

search reports: a) dividers between sections of the report to make it easier to locate specific portions of the search; (b) identification of the mark being searched from the top of each page of the report; (c) sequentially numbered pages in each section with an indicator of how many pages are in that section; (d) table of contents reflecting the cited mark, record number, page number where the record could be found, and status of the marks cited; (e) back cover on the report (to prevent the last page from falling off) with the signature of the researcher who completed the report. Corsearch's comprehensive trademark search reports also included notes from the researcher regarding decision criteria used by the researcher to select the most relevant records.

When Corsearch got into the trademark search business the average turnaround time on comprehensive search reports from T & T was ten to fourteen days, and Corsearch offered reports in three to five days. Corsearch was the first company to offer a full comprehensive trademark search in less than one day. T & T and Compu–Mark followed Corsearch. Corsearch was the first search company to offer a four-hour service. T & T and Compu–Mark followed. Corsearch is the only search company to assign one researcher to do all three parts of a given search, i.e. federal, state, and common law. Corsearch is the only company to guarantee delivery of a report even if Federal Express fails to arrive on time.

At the end of 1988, Corsearch was free of debt, other than trade payables, for the first time.

At the end of 1989, Corsearch had retained earnings of $561,161.

Corsearch has become T & T's main competitor in the computerized comprehensive trademark report market. At the present time, Corsearch's price for a three-to-five-day comprehensive trademark search is $255, more than ten percent lower than T & T's price of $285.[4]

for only about $250,000 of the approximately $800,000 that Dialog received from users of TS–State. These figures suggest that a very large portion of state trademark searching is being performed by entities other than Corsearch, T & T, or TRC.

## CORSEARCH'S DEVELOPMENT OF CORBASE

In 1989, following the PTO's offering of its computerized database, Corsearch decided to purchase that database and offer it on line to others. It chose a vendor for the project. In 1990, Corsearch announced that it was offering the federal database as an on-line service under the tradename Corbase. As a result of its acquisition of the federal database, Corsearch no longer had to pay Dialog for access to TS–Federal information. Like T & T, Corsearch affixes a copyright notice to reports generated by its own federal trademark database.

Once Corbase became operational, Dialog stood to lose revenue of approximately $600,000 per year that Corsearch otherwise would have paid for access to TS–Federal. Prior to approximately November of 1990, Corsearch was receiving a volume discount of ten dollars per hour from Dialog on the condition that Corsearch spend at least $100,000 a year in on-line time charges with Dialog. After November 1990, Corsearch and Dialog renegotiated the volume discount so that it became a sliding scale discount based upon usage and conditioned upon Corsearch spending $800,000 annually on the various on-line services offered by Dialog.

In June 1991 Corsearch began to investigate the possibility of building a state trademark database. Corsearch decided to begin studying the feasibility of building its own state database in 1991 because it concluded it was now in a financial position to take on a project of that magnitude. Corsearch judged that it would improve Corsearch's competitiveness to have an independent source of state trademark data and that Corsearch would then be no longer subject to its competitor's pricing.

Corsearch's 1992 Business Plan has allocated $100,000 for the initial study and planning of building Corsearch's own state trademark database.

4. T & T maintains that its comprehensive search reports are more comprehensive than Corsearch's.

In 1991, Corsearch projected that it would spend at least $750,000 over the next three years, 1992–1994, for TS–State license fees paid to Dialog.

## THE DEVELOPMENT OF CD–ROM SEARCHING

In late 1990, T & T licensed to Dialog the right to sublicense T & T's TS–Federal and TS–State to users in CD–ROM versions (the state version is hereafter referred to as the "T & T CD–ROM State"). A CD–ROM is a disk, similar to a musical recording compact disc. The T & T CD–ROMs are revised bi-monthly and T & T CD–ROM State contains the entire TS–State database as of the month of release. Using a personal computer, sublicensees of T & T CD–ROM State can search and print out from the TS–State database without using on-line services and incurring on-line charges.

The agreement between T & T and Dialog with respect to the licensing of the T & T CD–ROMs contained terms and conditions requiring the restriction of the use of the data contained on the T & T CD–ROMs to the user's internal purposes and expressly prohibiting the resale of the data. Def. Exh. B. The "Dialog on Disc License Agreement" utilized by Dialog in licensing the T & T CD–ROMs contained the following terms and conditions:

3. LICENSE.

A. DIALOG hereby grants to Customer and Customer hereby accepts from DIALOG a non-transferable and non-exclusive right and license to use the Products according to the terms and conditions set forth in this Agreement. Customer acquires no ownership rights respecting the Products, or portions thereof, and all such rights remain in DIALOG. Customer's use of the Products is subject to such disclaimers and restrictions on use that may be published by DIALOG and/or its suppliers in conjunction therewith. Such disclaimers and restrictions may be changed from time to time and Customer will be sent all revisions thereto. Neither the Products, nor any portions thereof, may be reproduced, transferred, or transmitted in any form or by any means without the prior written consent of DIALOG, except as expressly permitted hereunder.

B. Customer may use the Products only for internal purposes and shall not use the Products as a component of or a basis for a database prepared for commercial sale, access or distribution outside of Customer's organization. Customer is not permitted to alter or duplicate the Products in any way, provided, however, that Customer may make one (1) back-up copy of Software to use solely for emergency purposes.

C. Specific restrictions concerning Customer's use of the Products or portions thereof, include, without limitation, the following: (1) Products may be used only on a single computer at any time; (2) Products may not be used in a service or software rental bureau, timesharing, interactive cable television, multiple computer processing unit or multiple site arrangement; (3) Use of Products via a Customer network is permissible ONLY to the extent that Customer has so noted in the space provided for same elsewhere within the order form (in accordance with the then-applicable Product Price List); (4) Portions of the Database may for temporary use or storage in conjunction with Customer's editing or reformatting of data for purposes of making a single print-out (human-readable copy) thereof; (5) No telecommunications transfer of any portion of the Products may be made; (6) The Products, including any portions thereof, shall not be exported outside of the territorial limits of the country in which they were originally delivered; and (7) Customer may not modify, reverse engineer, disassemble, decompile or create derivative works based on the Products, or any portion thereof. Additional Database specific restrictions on use (and/or permissible uses) may be found within Documentation.

4. THIRD–PARTY ACCESS.

... No other transfer of Database portions are permitted under this Agree-

ment and no rights are granted permitting any systematic retrieval and printing of Database portions to third parties by or through any for-profit entity.

.　　.　　.　　.　　.

## 7. COPYRIGHT AND PROTECTION.

A. The Products, including all portions thereof, except where expressly stated otherwise, are protected by copyright and other laws respecting proprietary rights. Unauthorized reproduction, transfer and/or use may be a violation of criminal as well as civil law.

B. Customer shall take all necessary action, whether by instruction, agreement or otherwise, to restrict control and limit the use of and access to the Products to those uses expressly permitted hereunder (unless prior written agreement has been obtained from DIALOG) and shall protect and secure the Products, and all portions thereof, to prevent unauthorized copying, transfer or use.

C. The Products contain highly proprietary and valuable trade secrets of DIALOG and of its suppliers. Accordingly, it is acknowledged that unauthorized copying, transfer or use may cause DIALOG and/or its suppliers irreparable injury that cannot be adequately compensated for by means of monetary damages. It is therefore agreed that any breach hereof by Customer may be enforced by means of equitable relief (such as but not necessarily limited to injunctive relief) in addition to any other rights and remedies that may be available.

D. Customer agrees that any supplier of any portion of Products may enforce its rights against Customer even though such supplier is not a party to this Agreement.

Def.Exh. C. Dialog requires its sublicensees to agree to these terms prior to obtaining the TS–Federal or TS–State database on CD–ROM.

Mr. Frank was aware of these terms of the Dialog on Disc License Agreement and,

in late 1990 and early 1991, Corsearch requested that Dialog license to it T & T's TS–State database on CD–ROM. In approximately the spring of 1991, Dialog asked T & T if it would agree to permit the T & T CD–ROM State to be licensed to Corsearch or any other resellers of data. By letter dated May 31, 1991, T & T specifically advised Dialog that it did not wish to license its databases on CD–ROM to companies that frequently resell the information and that therefore the T & T CD–ROM would not be made available to resellers like Corsearch since their only purpose in obtaining the T & T CD–ROM would be to use it for resale.

No Corsearch officer or employee made any direct approach to T & T to ask T & T if it would agree to license its T & T CD–ROM State to Corsearch.

## CORSEARCH'S EFFORTS TO OBTAIN THE CD–ROM BY FALSE PRETENSES

By July 1, 1991, Corsearch had been advised by Dialog that TS–State would not be made available to it on CD–ROM. At about that time, Mr. Frank, without identifying his capacity as an officer of Corsearch, ordered a trial copy of the T & T CD–ROM State, not through Corsearch's usual Dialog representative in New York, but by letter written on Mr. Frank's home stationery and received by Dialog on July 3, 1991. By order form dated July 23, 1991, Mark Shklar, Esq., vice president of Corsearch, similarly submitted an application for the purchase of the T & T CD–ROM State utilizing his home address. This application similarly did not disclose Mr. Shklar's relationship to Corsearch.

In early or mid-July 1991 Dialog, in response to Mr. Frank's order, forwarded a trial copy of the T & T CD–ROM State to Mr. Frank at his home address, and sometime thereafter he was sent an updated version of the T & T CD–ROM State. Mr. Shklar also received a T & T CD–ROM State at home.

Without authorization or knowledge of Dialog or T & T, Mr. Frank and Mr. Shklar

caused Corsearch to utilize one or both versions of the T & T CD–ROM State for four to six weeks in preparing state trademark reports for its customers. The search reports produced by Corsearch using the T & T CD–ROM State copied exactly the selection, organization, and arrangement of the data in T & T's TS–State database and also copied the original material added by T & T to the database. Def. Exh. ZZZ. Corsearch's vice president, Mr. Shklar, testified that Corsearch made "heavy use" of the T & T CD–ROM State during this period and thereby avoided paying at least $26,000 that it would otherwise have had to pay for on-line access to TS–State through Dialog.

Corsearch had been advised previously by its then attorney, Ira Finkelstein, that Corsearch's surreptitious acquisition and use of the T & T CD–ROM State to generate reports for resale could constitute a breach of contract or fraud, and Corsearch was aware that such use could result in a cut-off of Corsearch's access to TS–State through Dialog.

Corsearch's 1992 draft Business Plan indicates that the state trademark reports that Corsearch generated by means of its unauthorized use of the T & T CD–ROM State were sold or resold to Corsearch's customers. The Plan stated as follows:

> Corsearch also depends upon another Thomson and Thomson product, Trademarkscan–State. It is the most reliable and lowest cost per search system available.... At the beginning of 1991, Corsearch was spending approximately $22 per search for Trademarkscan–State information. At that time Thomson and Thomson/Dialog introduced the information on CD–ROM (Compact Disc–Read Only Memory) for $3,000 per year. (Corsearch's on-line fees for this information are over $225,000 per year). Corsearch requested copies of the CD–ROM products and was denied such request by Dialog. The resolution of this matter is unclear.

> Corsearch obtained one state trademark CD–ROM disc for a brief period. During that time state trademark cost per search decreased by 25%. Presently management is unclear if the company will be able to keep the disc. The projections assume that the disc will have minimal usage during 1992. An average cost per search will remain similar to 1991 levels.

> Presently, Corsearch does not anticipate bringing legal action against either Dialog or Thomson & Thomson to force continued delivery of these products. Corsearch management understands that later either Thomson & Thomson or Dialog (or a joint effort) may bring charges against Corsearch for license agreement violations and/or copyright infringements. Corsearch's potential liability is the estimated additional fees that would have been levied had on-line information rather than CD/ROM information been used, and legal fees associated with the Company's defense. (Either bringing or responding to charges has associated legal fees. At the present, Corsearch would rather be the respondent than the complainant.)

> Corsearch management continues to pursue options aimed at reaching an agreement with Dialog and Thomson & Thomson on this matter. Since May, 1991 Corsearch's efforts towards establishing a meeting with senior managers of Dialog to discuss this issue have been rebuked. Corsearch has budgeted $60,000 for legal fees related to this issue in 1992.

Def.Exh. TT; Tr. 393 (Shklar).

In September 1991 Mr. Frank, on behalf of Corsearch, "downloaded" the T & T CD–ROM State onto computer tapes or disks. The contents of the CD–ROM State were copied in a form that could be retrieved by computer. Corsearch sent samples of the T & T CD–ROM–State database to an outside contractor to determine whether the contractor could convert the T & T database into a "Corsearch" state trademark database. In response to discovery requests in this action, Corsearch advised T & T of this copying and preservation of the CD–ROM, and, after demand, Corsearch's

attorneys turned over the discs or tapes containing the contents of CD–ROM State to T & T's attorneys on November 7, 1991. The T & T CD–ROM State received by Mr. Frank and Mr. Shklar had been returned on September 23, 1991.

## T & T's TERMINATION OF CORSEARCH'S RESELL RIGHTS TO TS–STATE

On August 14, 1991 T & T by letter to Corsearch terminated Corsearch's resale permission for TS–State. The termination letter was misaddressed. T & T re-sent the same termination letter to Corsearch's correct address on August 27, 1991.[5]

The termination letter gave Corsearch thirty days notice of termination. Mr. Becker, President of T & T, was unaware that Corsearch had asked for and received a ninety-day notice period. Corsearch notified T & T of the ninety-day notice period and Becker promptly extended the termination period for the ninety days. There were no further negotiations between the parties until after the initiation of this action alleging that T & T, a monopolist, is engaged in an illegal restraint of competition.

## COMPETITION IN THE TRADEMARK SEARCH BUSINESS

Over the years relatively few companies offered trademark services to lawyers and corporations in the United States. With the advent of computers in the late 1970s and 1980s, some companies entered the United States market, notably TCR and in 1983 Compu–Mark. T & T has conceded that "TCR's active marketing efforts and state of the art search software made them a credible, viable competitor within several years." Competition in trademark research services generally can be traced through T & T's Management Plans provided to its parent, the International Thomson Organization ("ITO").

*1983:*

The T & T 1984–1988 Management Plan prepared in August 1983 contains the following chart dealing with pricing, market shares, and financial/managerial stability:

| Co. | Pricing Full Search | Market Shares | Financial/ Managerial Stability |
|---|---|---|---|
| T & T | 150 | 50 | Stable |
| TCR | 165 | 28 | Shareholders Suit Pending Negotiating with Mead Data Central |
| Compu–Mark | N/A | 0 | Stable |
| TSC[6] | 140 | 14 | Company changed hands 3 times in 12 years President of longstanding let go 6/83 by CT Corp. |
| PTO Searchers | 50–75 | 8 | Stable |

**5.** Shortly after August 27, 1991, T & T also terminated resale permissions granted to other resellers. Law firms who often provide clients with copies of reports generated by T & T's databases were not terminated. Law firms that distribute these reports to clients are regarded by the Court as acting as agents of their clients and not as competitors in the trademark search market.

**6.** "TSC" refers to Trademark Service Corporation, a subsidiary of Commerce Clearing House later called Trademark Research Corporation ("TRC").

*1984:*

T & T acquired TCR Service, Inc. on April 11, 1984, taking advantage of a stockholders' dispute to purchase its largest competitor. T & T saw benefits in utilizing TCR's strengths to augment its own and to overcome certain "deficiencies."

T & T's reasons for acquiring TCR "included the quality of their database, their large and more up-to-date software development staff, and their core of qualified search analysts." T & T then developed scenarios for integrating the T & T and TCR databases and utilizing the TCR systems on both an interim and continuing basis to satisfy both reporting and searching needs. The acquisition of the TCR (federal) database was viewed as an "aid in the clean-up and enhancement" of T & T's own database. "While each database has deficiencies, each complements the other. T & T's basic weaknesses of less than full text content and little historical data are TCR's greatest strengths. By combining the strengths of each database, T & T will have compiled the most complete and accurate trademark database available."

In regard to its federal database, T & T's view in 1984 was that "many inactive T & T records which contained typographical errors and inconsistencies will be overlaid completely with more accurate TCR data." With respect to T & T's state database, information contained in the TCR database would be used to verify the accuracy of T & T's information. By combining the largest two search operations in the United States, T & T further solidified its position in the industry and enjoyed a seventy-five percent share of the United States trademark search business.

T & T estimated that the United States market for trademark searches for 1984 was as follows:

U.S. Trademark Search Activity
Estimates of Market Size/Share 1984

| Firm | Number of Searches/ Year | Average Search Price | Estimated 1984 Sales (millions) | Market Share % |
|---|---|---|---|---|
| Thomson & Thomson/ TCR Services, Inc.* | 75,250 | $190 | $14.3 | 75 |
| Trademark Service Corporation | 10,700 | $140 | $ 1.5 | 8 |
| Compu–Mark | 5,000 | $120 | $ .6 | 3 |
| Private Searchers Working at PTO (25) | 60,000 | $ 45 | $ 2.7 | 14 |
| TOTAL U.S. Market | $150,950 | – | $19.1 | 100 |

* Includes TCR sales prior to acquisition by T & T.

As of 1984, T & T claimed to be "the price leader in the industry" and recognized that it must be "cognizant of competitors' attempts to gain market share by undercutting our rates." Its then competitors, TSC and Compu–Mark, priced their searches more than thirty dollars below comparable T & T services as of 1984. As of mid-August 1984, the Compu–Mark online search system was "just becoming fully operational."

*1985:*

The 1985–1989 T & T Management Plan identified several areas where acquisitions or joint ventures might be possible. It stated that "no acquisitions will be entered into unless they fall within the ITO requirements for cashflow, paid back with investment and other prescribed financial targets."

*1986:*

The 1986–1990 T & T Management Plan prepared in the fall of 1985 noted the shift and the nature of trademark searching "toward heavy on-line usage" and projected healthy growth in the Trademarkscan product in the context of providing it through Dialog. It reported that as what is now called TS–Federal approached its second anniversary it achieved gross sales of $1.5 million a year. With an erosion of traditional search business in favor of on-line searching, 235 of T & T's top 500 clients have become regular users of TS–Federal.

T & T management reported that its introduction of Trademarkscan had been a correct move since, had it not taken place, the Compu–Mark system would have been infinitely more successful. T & T noted that being first on line also "enhanced the image of T & T as a leader and innovator."

The T & T 1986–1990 Plan also announced that T & T would take two steps to control the future negative impact of TS–Federal on its sales revenues, both of which would be covered in the contract renegotiations with Dialog scheduled for the fall of 1985. First, T & T would insist on control of future price increases and would adjust the price as needed to maintain its margins. Second, T & T would insist on receiving detailed usage information, to enable it to track usage by key T & T clients and tie it to possible declines in traditional research business. In August of 1985 T & T management estimated it serviced approximately seventy-four percent of the domestic market for trademark research. T & T stated that Compu–Mark had made inroads into this market, although their product addressed primarily marks that had been registered, giving light treatment to marks established by common law usage.

T & T also reported that it had seen the loss of some clients to TSC based on aggressive price competition, but that these clients for the most part had returned to T & T.

Assessing the TCR acquisition, T & T's 1986–1990 Management Plan stated:

> Despite the burdens imposed on T & T by the TCR acquisition, that purchase has been invaluable in foreclosing an opportunity for others to buy an established competitive position in the marketplace. For that reason alone, but also for several others, the TCR acquisition has proven well worth the cost involved.[7]

The 1986–1990 Plan's estimate of dollar sales and market shares and average search prices for T & T and its competitors in 1985 was as follows:

> T & T: 68,000 searches at an average price of $212 with total estimated 1985 sales of $14.5 million with $700,000 from Trademarkscan and a market share of 74.2%.

> TSC: 10,000 searches at an average price of $150 for estimated 1985 sales of $1.6 million and a 7.8% market share.

7. This first evidence of T & T focusing on poten- tial entry into the market by purchasing a com-

Compu–Mark: In-house searches 4,000 at an average price of $135 with estimated sales of $600,000 and on-line sales of $100,000 for a market share of 3.4%.

Private Searches at U.S. PTO and all information brokers: 60,000 searches at an average price of $50, total 1985 estimated sales of $3 million and a market share of 14.6%.

The total United States market was estimated at 142,000 searches with total estimated sales of $20.5 million.

The 1986–1990 Plan contained a one-page treatment of Corsearch noting that in the Spring of 1985 Corsearch began to advertise the availability of a "full search." Corsearch offered two benefits: a search less expensive than T & T's (cost $175) but more expensive than TRC or Compu–Mark, and twenty-four-hour turnaround time. T & T noted several problems that Corsearch had, including "fairly high on-line cost associated with each search" meaning that they were making "a minimal profit on each search performed."

T & T said it would continue to monitor the progress of Corsearch, indicating concern that perhaps other information brokers might follow Corsearch's lead and piggyback into a position in the trademark search business. T & T noted a positive side to Corsearch getting in the business: "T & T does get income from each trademark search performed by Corsearch and the other information brokers. Also, these brokers are creating an awareness of both trademark searching in general and of our Trademarkscan database." As a means of retaining or increasing market share, T & T said it would continue to monitor the activities of competitors and would react to each as the situation warranted.

The 1986–1990 Plan also noted that TS–Federal might "cannibalize our internal search business." The report continued: "If we do experience major erosion as a result of on-line, we will begin to reduce search staff as needed and will increase the price of on-line searching to maintain our margins and to reflect the value of the on-line product(s)."

*1987:*

T & T's 1987–1989 Management Plan prepared in the fall of 1986 noted that Corsearch "experienced the fastest sales growth of the search firms. However, they already operate on the smallest margins of any firm, due to total reliance on databases supplied by others. This margin will decrease further when Trademarkscan prices are increased in the Fall." The chart reflecting information about T & T and its competitors and information about each for 1986 showed that T & T had an average search price of $222 and a market share of 71.2%. TRC had an average search price of $160 and a market share of 6.3%. Compu–Mark (US) had an average search price of $150 and a market share of 8.5%. Corsearch had an average search price of $200 and a market share of 1.9%.[8] T & T's increase in average search price was in line with, or lower than, its competitors.

*1988:*

The 1988–1990 Management Plan prepared in the fall of 1987 revealed that T & T "continued [its] competitive intelligence and analysis program." Pl. Exh. 229, p. D3172. The only competitor mentioned in the "Trademark Research" section of the Plan was Corsearch, which was noted as having "been creative about their packaging and presentation, and they have been successful at promoting a same-day search and other quick turnaround services."

T & T observed that the availability of the Trademarkscan database "to other

---

petitive position comes a year and one-half after the acquisition in question. On the basis of credible testimony by Mr. Harrington, the Court finds this sentence represents justification to T & T's parent ITO for the cost of a criticized transaction.

8. In the fall of 1987, T & T acquired Compu–Mark S.A. primarily for its overseas trademark business. This acquisition eliminated a T & T competitor in the United States. T & T continued to operate Compu–Mark as a division in the United States.

trademark search firms and information brokers also creates a risk." Some firms using Trademarkscan were suggesting to clients that their reports based on Trademarkscan were as complete and thorough as the T & T full search. T & T stated that "the action we have taken so far includes ... raising the price of Trademarkscan to make to make it difficult for another firm to use it as a source and undercut the T & T full search price."

The 1988–1990 Management Plan set forth the following trademark search market shares:

| | |
|---|---|
| T & T/Compu–Mark | 81% |
| TSC | 5% |
| Corsearch | 2% |
| All others | 12% |

*1989:*

In the 1989–1991 Management Plan prepared in the fall of 1988 T & T noted that "Corsearch continues to aggressively market their services, stressing the use of on-line databases and quick turnaround. The company will spend an estimated $200,000 on the Trademarkscan databases in 1988." The Plan went on to note that "in assessing opportunities for competitive attack against us, we believe there are two 'client needs' that competitors can seek to exploit: speed of delivery and price."

In a May 18, 1989 Memorandum, T & T noted that Corsearch's "search product is well presented and has many good features that [T & T] should take a serious look at." It also stated that "Frank's aggressive approach makes him a more formidable competitor than TSC," and that "Corsearch presents the threat of taking market share from T & T, but only if we let them."

*1990:*

The 1990–1992 Management Plan prepared in the fall of 1989 once again monitored Corsearch's progress, noting that Corsearch

> continues to compete aggressively by effectively marketing itself as an alternative to our Full Search. Reports indicate that they are increasing their market share. If projected sales of $1.5 million for 1988 were achieved, their sales

growth from 1987 to 1988 was an impressive 76% resulting in an estimated 5% market share.... Corsearch has been the largest user of the Trademarkscan databases and among the first to purchase the USPTO tapes.... Their aggressive nature and enterprising use of other databases for common law trademarks, makes Corsearch the number one competitor during the plan period to the full search products.

## T & T's CHANGE OF MANAGEMENT

Mr. Becker was brought in from another ITO entity to be president of T & T in August 1990 with instructions to improve its marketing and sales. T & T trademark search sales had been flat and unit volume had decreased. Mr. Becker first considered terminating Corsearch's permission to include data from TS–State in its search reports in the fall of 1990, around the time Mr. Becker supervised the preparation of T & T's 1991–1993 Management Plan. That Plan acknowledged that

> Corsearch continues to be the most aggressive competitor to our full search product. Their estimated market share in 1990 is approximately 8%, up from 5% in 1989. Their gain came at our expense as they targeted our largest clients.

In the 1991–1993 Plan, T & T stated that its past price increases, averaging eight to ten percent, were reasonably aggressive, but would be constrained in the future by increased competitive activity sensitizing customers. T & T also noted that competition has caused it to increase its customer discounts.

*1991:*

On or about July 18, 1991, Mr. Becker had a conversation with Susan Yoder of Dialog in which he discussed the possibility of terminating Corsearch's use of TS–State. Mr. Becker speculated with Ms. Yoder that Corsearch might create its own state database and compete with T & T. Ms. Yoder tried to talk Mr. Becker out of

terminating Corsearch, a large customer of Dialog, and as a result of this conversation and a later conversation with Ms. Yoder, Mr. Becker did not send a letter of termination to Corsearch until August 14, 1991, instead of on July 18, 1991.

In late 1990, when he first considered terminating Corsearch, Mr. Becker was not aware that Mr. Frank or Mr. Shklar had obtained a T & T CD–ROM State from Dialog, or that Corsearch had been using the CD–ROMs. Tr. 1445–46 (Becker).[9] However, Mr. Becker testified that he learned in early August that Mr. Frank had obtained the CD–ROM in Mr. Frank's own name. Tr. 1432–34 (Becker). Mr. Becker testified that he sent the termination letter on August 14 because he had learned that Mr. Frank had obtained the CD–ROM, although Mr. Becker was uncertain at that point whether Corsearch was using the CD–ROM in violation of its license. Tr. 1446–49 (Becker).

## T & T'S CHANGE OF POLICY

The 1992–1994 Management Plan, prepared in the fall of 1991 and issued after this lawsuit was initiated, stated with respect to its on-line services:

> We now expressly forbid the reproduction and resale of our data for any commercial trademark research. We expect a decrease in usage on both systems as a result of this, but expect to see an increase in other in-house research products.

The Plan also noted that while the right to resell "clearly increased on-line revenues, it negatively impacted other revenue streams." The "revenue stream" most impacted was T & T's full search report. As of the fall of 1991, full U.S. searches accounted for approximately sixty percent of T & T's business. In 1983, it had been ninety-five percent. It is evident that T &

T sought to increase its market share of sales of full search reports and its on-line and CD–ROM products to end users by terminating permission to use the data from TS–State for resale regardless of the short term loss of revenue from Corsearch's and other trademark research services' use of TS–State. Tr. 1340, 1341, 1460–63 (Becker).

With respect to Corsearch, the 1992–1994 Management Plan noted that "Corsearch and numerous other small information brokerage/research firms have made successful inroads with many of our customers competing on service and price."

The 1992–1994 Management Plan (Pl. Exh. 232), Interrogatory Answer No. 9, the notes of Mr. Becker on p. D3829 of Pl. Exh. 243 and on Pl. Exh. 138, and Mr. Becker's conversations with Susan Yoder, together demonstrate that the revocation of TS–State resale permission was designed and intended to prevent Corsearch's ability to piggyback on T & T's copyrighted materials. Tr. 1419, 1450–55 (Becker), Pl. Exh. 124. The revocation also stemmed from T & T's marketing strategy aimed at differentiating between searches done using TS–State or TS–Federal, which T & T originated and marketed as screening tools, and the more exhaustive internal searches performed by T & T using its internal M–204 database. Tr. 1408–17, 1442–59 (Becker); Becker Aff., ¶ 18.

## COPYRIGHTABILITY OF THE TS–STATE DATABASE

 The United States Copyright Office has issued a Certificate of Copyright Registration, effective as of November 15, 1991, for T & T's CD–ROM version of the TS–State database. This certificate gives rise to a legal presumption that the TS–

---

**9.** On August 8, 1991 Dialog wrote to Mr. Frank requesting return of the T & T CD–ROM State and sent a facsimile copy to Mr. Fantasia of T & T. Def. Exh. LL. Mr. Frank responded on August 12, 1990 that he had a right to resell the information. Def. Exh. MM. On September 12, 1991, Dialog demanded return of the CD–ROM by certified mail. Def. Exh. NN. On September

18, 1991 Mr. Frank wrote to T & T that he had returned the CD–ROM. Def. Exh. OO. On September 19, 1991 Dialog responded, making clear that it was not referring to the trial offer but the replacement sent to Mr. Frank. Def. Exh. PP. On September 23, 1991 Mr. Frank returned the T & T CD–ROM State to Dialog. Def. Exh. QQ.

State database is copyrightable.[10] 17 U.S.C. § 410(c); *but see Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 414 (2d Cir.1985) (certificate creates no irrebuttable presumption of copyright validity but rather merely orders the burdens of proof). Corsearch sought to impugn the validity of the certificate by a post-trial motion to supplement the record with affidavit evidence which the Court admitted into evidence *nunc pro tunc*.

While facts are not copyrightable, some factual compilations are. The Supreme Court's opinion in *Feist Publications v. Rural Telephone Service Co.* focused on the "undeniable tension" between these two propositions. —— U.S. ——, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991). To qualify as a copyrightable compilation, a work must meet each of three distinct elements: "(1) the collection and assembly of pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement, of an 'original' work of authorship." *id.* 111 S.Ct. at 1293; 17 U.S.C. § 101. In determining whether a fact-based work is an original work of authorship, as opposed to a mere collection of facts, a court should focus principally on the second requirement. 111 S.Ct. at 1294; *see also Kregos v. Associated Press*, 937 F.2d 700, 703–04 (2d Cir.1991) (factual compilation entitled to copyright only if it displays some minimal level of creativity).

The evidence offered by Corsearch is insufficient to render invalid T & T's copyright. As discussed above, T & T offered sufficient evidence of its selection, coordination, arrangement, enhancement, and programming of the state trademark data, as well as other contributions that establish the originality and requisite creativity, and thus copyrightability, of the TS–State database. The TS–State database is unlike the white pages of the telephone directory at issue in *Feist*, in which the telephone company simply listed alphabetically by surname the data provided by its subscribers,

creating "a garden-variety white pages directory, devoid of even the slightest trace of creativity." *Id.* 111 S.Ct. at 1296.

■ A copyright in a compilation, however, "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). Thus, T & T's copyright extends to its internally generated information and to its particular enhancements to the items of information collected from the state trademark records, not to the items of information themselves collected from the states. *See Kregos*, 937 F.2d at 709. If it was able to identify which items of information were state-generated items of information obtained from the fifty states and Puerto Rico, Corsearch might select them and rearrange them in Corsearch's own, original format without violating T & T's copyright. *Cf. Feist*, 111 S.Ct. at 1295–96 (defendant did not infringe plaintiff's copyright when it copied substantial amount of uncopyrightable facts from plaintiff's telephone directory without copying any information original to plaintiff). T & T permissibly enforced its copyright by terminating Corsearch's permission to resell reports from TS–State, since those reports copied TS–State exactly, including T & T's enhancements to the state trademark data. Def. Exh. ZZZ. Accordingly, the Court will not enjoin T & T from enforcing its copyright notice for TS–State.

## ABUSE OF MONOPOLY POSITION

■ T & T's termination of permission to use TS–State data for resale is not a violation of the antitrust laws under § 2 of the Sherman Act. Under the copyright laws, the copyright owner has a right to license the use of its intellectual property and to terminate or limit that use in such manner as it deems appropriate. *See Fox Film Corp. v. Doyal*, 286 U.S. 123, 127–28, 130, 52 S.Ct. 546, 546–47, 547–548, 76 L.Ed.

---

**10.** Because the CD–ROM version of TS–State is simply a disk that contains the entire TS–State database available on line from Dialog, any analysis of the copyrightability of the CD–ROM version applies with equal force to the on-line version.

1010 (1932). Indeed, such a right is the basis of substantial economic activity in the present day economy. Any termination of a licensee of intellectual property who is competing with the owner is bound to eliminate or curtail competition. Where the owner and the licensee are among a few companies competing in a submarket, the effect on competition on that submarket is even greater. Nevertheless, before ruling that a copyright owner is or is not liable for abuse of monopoly position when it terminates a licensee in accordance with the rights set forth in its license, a court should examine the implications surrounding such a ruling. Many intellectual property dispensers operate in limited markets with few competitors. Indeed, it is the limited number of competitors that makes the copyright valuable to its owner. Although the collection of data and its enhancement may not constitute "genius," see United States v. Paramount Pictures, 334 U.S. 131, 158, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948) (issuance of copyright "serves to induce release to the public of the products of ... creative genius"), copyright protection offers the incentive for the creation of copyrightable compendia and information banks from which the public benefits. See Stewart v. Abend, 495 U.S. 207, 110 S.Ct. 1750, 1764, 109 L.Ed.2d 184 (1990) (Copyright Act, in granting limited copyright term, balances artist's right to control work during term of copyright protection and public's need for access to creative works).[11]

The Supreme Court stated the elements of a § 2 Sherman Act violation in United States v. Grinnell Corp.:

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as

distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Accordingly, the Court must examine the nature of the relevant market and T & T's role in that market, as well as other structural features of the market and submarket, particularly entry barriers or barriers to expansion.

(a) Market changes since 1983

The trademark information market has changed since the fall of 1983. In 1983 approximately 95% of T & T's trademark-related revenues were derived from its full search services. Pl. Exh. 254, p. D4202. By 1990, in contrast, full searches represented only approximately 62.4% of T & T's revenues. Pl. Exh. 231, p. D3723. Until 1987 the estimated number of full searches performed each year was only slightly less than the total number of federal trademark registrations. See Def. Exh. DDDD; Pl. Exh. 228, p. D2936; Pl. Exh. 232, p. D3784. However, once the PTO database became available on line beginning in late 1986, the gap between the estimated number of full searches and the number of federal registrations began to widen dramatically. By 1990, there were approximately twice as many federal registrations (127,294) as there were estimated full searches (60,000–70,000). Def. Exh. DDDD; Pl.Exh. 232, p. D3784; Tr. 1577 (Becker). The only reasonable conclusion is that comprehensive trademark search services did not grow in pace with the overall trademark information service market and that a great deal of searching is now being performed not by trademark search companies, but by law firms, corporations, and other end users. These searches are being substituted for full searches that would, in the past, have

---

**11.** See also Sony Corp. of Am. v. Universal City Studios, 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984) (limited monopoly conferred by Copyright Act "is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired"); cf. Mannington Mills v. Congoleum Indus., 610 F.2d 1059, 1070 (3d Cir.1979) (determining whether patent holder's conduct violated antitrust laws required weighing potential injury to competition against risk that application of antitrust sanctions will frustrate purposes of patent system); International Wood Processors v. Power Dry, Inc., 792 F.2d 416, 426 (4th Cir. 1986) (noting same tension between antitrust and patent laws).

been performed by companies like T & T, TRC, or Corsearch.

The law firms, corporations, and other end users performing these searches now have ready access to computerized information resources such as on-line computerized federal trademark databases offered by Mead Data Central, IMS–Marq (owned by Dun & Bradstreet), T & T's TS–Federal, Compu–Mark–Federal (owned by T & T), Corsearch's Corbase, CGS Insight, Control Data of Canada Ltd., and TRC (owned by Commerce Clearing House). Tr. 261 (Landsman), 450 (Shklar), 1356 (Becker). Corsearch is also negotiating to put its own Corbase federal trademark database on line in 1992 through a competitor of Dialog. Tr. 443 (Shklar); Def. Exh. TT. In addition, law firms and corporations can now purchase rights to federal databases on CD–ROMs from TRC, T & T, and CGS Insight, or can purchase the PTO's own database.

Law firms and corporations can obtain common law trademark information directly from several sources, including Nexis, Maxline, and Dialog, which are among the sources used by X–L Corporation and Corsearch.

State trademark information is currently available to law firms and corporations on line from Dialog in the form of TS–State, as well as in CD–ROM format, and is expected to be available from TRC on CD–ROM. Mead Data Central has developed and offers a state trademark database containing information on some states, but not all. Control Data of Canada is planning to offer a state trademark database. Davidson Aff., ¶¶ 5, 6.

This increase in the number of companies offering trademark search information means that more companies are presently positioned to enter the comprehensive trademark search market and that costs of entry to that submarket will be or are lower for those companies already offering their own on-line federal trademark databases, since they need only obtain a state

database to be able to enter the comprehensive search market. This rapid change in the overall trademark information market is important in evaluating T & T's conduct in the relevant market, as required under *Grinnell.* *See* 384 U.S. at 570–71, 86 S.Ct. at 1703–04.

(b) *The Relevant Market*

■ The criteria for determining a relevant market was enunciated in *Brown Shoe Co. v. United States:*

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 593–595 [77 S.Ct. 872, 878, 1 L.Ed.2d 1057 (1957)]. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962) (footnotes omitted).

Based on Dr. Stewart's unrebutted testimony and the Court's own review of the evidence, the Court finds that in its competition with T & T Corsearch is currently offering only comprehensive trademark searches, and thus the relevant submarket here is the market for comprehensive trademark search reports in the United States. In determining market strength in that market, the performance of "knock-out" searches and end users' use of on-line services rather than comprehensive trademark search reports should not be considered, despite the increasing activity in that aspect of the overall market[12] for

---

**12.** That increasing activity is only relevant to the issues of barriers to entry and likelihood of

increased competition.

trademark information and Corsearch's planned offering of Corbase through on-line services. T & T's own annual management reports treat its comprehensive trademark search reports as separate from other activities. Furthermore, all the attorney witnesses recognized comprehensive trademark search reports as a market. Most importantly, the evidence demonstrates that these reports have distinct customers and distinct pricing.

Based on this definition of the relevant submarket, T & T has had a dominant position in that submarket for many years. If one looks merely at the known companies supplying comprehensive trademark searches, the share by T & T of the relevant submarket ranges in the area of seventy-five to eighty percent. Such concentration of economic power is strong evidence of a monopoly. *See Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704; *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 429 (2d Cir.1945); *United States v. United Shoe Mach. Corp.*, 110 F.Supp. 295, 341, 343 (D.Mass.1953), *aff'd per curiam*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). However, "the relative effect of the percentage command of a market varies with the setting in which that factor is placed." *United States v. Columbia Steel Co.*, 334 U.S. 495, 527–28, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948). The general trademark information market has changed, and that change portends further competition in the submarket, since a number of new entrants to the general market have more than adequate finances to enter the submarket.

(c) *T & T's acquisitions of TCR and Compu–Mark*

■ The preponderance of the evidence shows that T & T obtained its prima facie monopolistic position in the trademark search field by virtue of its foresight and its diligent efforts extending over many decades which enabled it, first, to compile its own records and then, in recent years,

to develop databases that helped T & T to maintain a position as the leading source of more trademark search information than any other United States entity including governmental agencies. *Cf. United Shoe Mach.*, 110 F.Supp. at 343 (finding violation of § 2 where defendant had such strength in relevant market that it controlled that market, its strength excluded potential and limited actual competition, and its strength was not attributable solely to its ability, research, natural advantages, etc.).

T & T acquired TCR in April 1984 not because it was engaged in a predetermined effort to purchase its competitors, but because that corporation was up for sale due to an ongoing stockholder fight. Although the acquisition added to T & T's data information, provided T & T with an up-to-date software development staff, and permitted T & T to clean up and enhance its own trademark database, there is no evidence that the acquisition was undertaken in order to acquire or maintain a monopoly position and prevent competition. The most that can be said is that the acquisition was justified to T & T's parent ITO a year and a half later by those responsible for it "as foreclosing the opportunity for others to buy an established competitive position in the market place."

In the fall of 1987 T & T acquired Compu–Mark after failing in an attempt to purchase only Compu–Mark's European and worldwide operations. T & T justified the acquisition as giving T & T immediate entry to the European trademark search market. Once again there is no evidence that T & T acquired Compu–Mark's considerably smaller United States operation in order to maintain T & T's monopoly of trademark search business in the United States or to prevent competition. Indeed the evidence is that T & T sought only Compu–Mark's overseas operations but was required to purchase the United States operations of Compu–Mark as a condition of purchase.[13]

---

**13.** T & T argues that since T & T acquired the TCR and Compu–Mark databases more than four years prior to the commencement of this action, and thus outside of the four-year limita-

tions period for antitrust actions, those acquisitions should not form a basis for liability in this case. Corsearch contends that the antitrust statute of limitations is irrelevant to the issue of

Thus, T & T's acquisitions of TCR and Compu–Mark are unlike the actions of Aluminum Company of America ("Alcoa") in *United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir.1945). Alcoa, which had a monopoly in the market for ingot, had succeeded in forestalling all competition by anticipating increases in the demand for ingot and preparing to supply it by "doubling and redoubling its capacity before others entered the field." *Id.* at 431. The court found that Alcoa's actions were exclusionary in nature and were a part of Alcoa's "persistent determination to maintain ... control" over the ingot market. *Id.* at 430; *cf. also Grinnell*, 384 U.S. at 576, 86 S.Ct. at 1706–07 (finding that defendant consciously acquired monopoly power through, *inter alia*, acquisition of longstanding competitor).

### (d) *Barriers to entry*

There is no entry barrier here resulting from an ownership of scarce resources. The basic resources are the state records, which are filed with each state and are available to any entity interested. The federal records are available at the PTO and through on-line information services available from Dialog, Maxline, Lexis, etc. Nor is T & T's copyright ownership a factor that limits any other company's ability to compete. The copyrights apply only due to T & T's work product—its enhancements to the items of information contained in the records—not to the items of information themselves, which are on file at the state offices. Thus, T & T's ownership of valid copyrights over its TS–State and TS–Federal work product is not a barrier to entry by competitors. Accordingly, the situation here is different from *United Shoe Machinery Corp.*, where the multiplicity of

patents held and their complexity were found to deter entry to the market by would-be competitors. 110 F.Supp. at 332–33, 339. It is also different from the situation presented in *Associated Press v. United States*, 326 U.S. (1 Pet.) 1, 8–10, 65 S.Ct. 1416, 1418–19, 89 L.Ed. 2013 (1945), where the erection of obstacles to the procurement of Associated Press membership prevented non-members from obtaining any of the news furnished by the Associated Press or any of the individual members of its combination of American newspaper publishers. Here, T & T's copyright interests do not have that exclusionary effect.

Since 1989, anyone has been able to purchase a copy of the PTO's computerized federal trademark database. Access to a federal database is a "cost of entry" without any accompanying time component. Judging by the number of new entrants to the field, the cost of entry is reasonably priced.

Access to state trademark database information is also a "cost of entry," but with an accompanying time component. Thus, the cost of entry is higher. However, as trademark information is available from the fifty states and always has been, a barrier to entry does not exist. No existing competitor has any exclusive contracts with any necessary supplier that would present an artificial obstacle to entry by Corsearch or others. The need for capital to hire personnel to compile and update a state trademark database does not constitute a "barrier to entry." [14] Indeed, once the federal database has been acquired, many of the costs for a state database are reduced.

Compilation of a state trademark database was a "cost of entry" to T & T and

---

whether T & T willfully acquired or maintained its monopoly, so long as the exclusionary acts causing injury to the Plaintiff occurred or continued within the four-year period. *Cf. Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir.1979) (finding "that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period"), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Since the Court finds that

T & T did not acquire TCR and Compu–Mark to maintain its monopoly position or to prevent competition, this question need not be resolved.

14. Furthermore, plant and equipment needs for a trademark information service are modest and can be readily satisfied in the open market, Tr. 181–82 (Lee); Becker Aff., ¶ 28, and there is no evidence of artificial barriers or exceptional costs connected with fulfilling any of these needs.

also one borne by TRC, Compu–Mark, and TCR as later entrants into the comprehensive trademark search market served by T & T. That cost of entry can be measured in both time and expense. With the recent advances in computer technology, it is now easier and less costly in time and expense to compile such a database than it was in the past. Gevers Aff., ¶ 13. As a result, companies in addition to T & T and TRC are presently commencing to compile and offer state trademark databases to end users. Mead Data Central and Control Data of Canada, for example, have apparently determined the assemblage of the state database is a natural concomitant to their existing PTO database. The estimated expenditure of time and money has not been a barrier to such companies.

Furthermore, the evidence shows that it would not be a barrier to Corsearch. Compu–Mark, which entered the United States trademark information service in 1983, assembled a state database in a year for an expenditure of $200,000. Gevers Aff., ¶ 10. With Corbase as a foundation, Corsearch should be able to assemble the same data in less time. In or about the beginning of 1989, T & T analyzed the cost of adding images to the records contained in its state trademark database. The results of that analysis were presented in a report authored by Paul Champagne entitled "Capturing of State Images." Tr. 1749 (Johnson); Johnson Aff., ¶ 12; Pl. Exh. 20. Mr. Johnson testified that the estimate prepared by Mr. Champagne also constitutes a fair estimate of the cost of preparing an entirely new state trademark database. Johnson Aff., ¶ 13. This total estimate was approximately $725,000. Johnson Aff., ¶ 13; Pl.Exh. 20. Mr. Becker, who made a credible witness, testified that a state database could be constructed from scratch in less than a year. Becker Aff., ¶ 28. Even making allowances for inflation from 1984 to date, Corsearch appears to have the financial ability to assemble its own state trademark database. In June of 1991, Cor-

search, which had $561,000 in retained earnings and no debt at the beginning of 1990 and profits thereafter, concluded it was in a financial position to take on the creation of a state trademark database. It sought instead to obtain the same result by utilization of the T & T CD–ROM State or by means of this lawsuit, each of which would avoid any capital expenditures.

(e) *Pricing Policies*

T & T's pricing policy has not been one that would deter market entry. The evidence shows T & T's comprehensive trademark search reports were priced higher than any competitor's. In *United Shoe Machinery,* that company's pricing policy caused profits to be low on the simplest machines, making entry into the market less likely by would-be competitors. 110 F.Supp. at 340–41. In contrast, here the pricing of TS–State and TS–Federal by T & T and Dialog was such that competitors, like Corsearch, Paul Lee, and X–L Corporation, were easily able to piggyback on T & T's work product and enter into competition with T & T's exhaustive full search reports.[15]

Although the pricing of TS–State and TS–Federal were raised to affect prices charged by resellers because resellers were using TS–State and TS–Federal in reports suggested to the customers to be as complete and thorough as the full T & T internal searches, T & T's pricing policies do not appear to have been utilized to foreclose competition, even competition from Corsearch. Pl. Exh. 229, p. D3187–88. That same exhibit indicates that management of T & T at that time was of the opinion that resellers should not be restricted since there were marketing benefits for T & T. Instead of placing Corsearch in a financial squeeze by reducing the price of its comprehensive trademark search report, the record indicates that T & T consciously raised those prices to be "the price leader in the trademark search business." Pl.

---

**15.** T & T's pricing of TS–State and TS–Federal evidently did not properly reflect the costs of T & T's research operations and software utilized to create its internal databases, which were then utilized not only for comprehensive trademark searches but also partially utilized to create the TS–State and TS–Federal databases.

Exh. 228, p. D3019. In its 1987–1989 Management Report, T & T stated, "Our clients are aware of the premium they pay for our products compared to the competition. Their lack of resistance to our pricing philosophy has encouraged us to retain this position in the future." Pl. Exh. 228, p. D3019. Since Corsearch and other, similar companies had entered the field due to the comprehensive trademark search availability provided through TS–State and TS–Federal and were dependent for years on those on-line services, a predatory monopolist would have raised the costs of those services and lowered the costs of its competitive product to make competition impractical. There is no evidence that T & T engaged in this tactic. There were, of course, price increases for TS–Federal and TS–State during the 1980s, but the record does not indicate that T & T's increases were out of line with T & T's costs or with prior price increases of Corsearch and other competitors during the same period. During that same period, Corsearch's earnings reports moved from red ink far into the black, despite T & T's price increases.

### (f) Termination of Corsearch's license

If a price squeeze of a competitor is a recognized anti-competitive device by a monopolist, why is T & T's termination of a supply contract, TS–State, to Corsearch, a competitor, not also violative of the Sherman Act?

T & T argues that, regardless of any antitrust limitations, it was entitled to terminate unilaterally Corsearch's license to use TS–State for resale purposes because of the statutory monopoly conferred upon T & T by its copyright in TS–State. T & T cites *Miller Insituform v. Insituform of North America*, 830 F.2d 606 (6th Cir.

1987), *cert. denied*, 484 U.S. 1064, 108 S.Ct. 1023, 98 L.Ed.2d 988 (1988), in which the court held that termination of an exclusive sublicense to use a patented process for the rehabilitation of pipe lines did not give rise to a § 2 violation. The court noted that while a patentee may not "*expand* the limited monopoly granted by the patent laws," *id.* at 608 (emphasis added) (citing *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir.1981)), the patentee "retains the power to exclude others from manufacturing, using, and selling his inventions without running afoul of the antitrust laws." *Id.* at 609. The court added that the defendant's assumption of the positions both of licensor and competitor with its licensee had "no adverse effect on competition since, as a patent monopolist, [defendant], from the start, had exclusive right to manufacture, use, and sell his invention." *Id.*

This analysis is largely applicable to T & T's copyright, because the copyright similarly granted T & T a limited monopoly over its state database, as discussed *supra*. Moreover, the situation here is different from that in *International Wood Processors v. Power Dry, Inc.*, 792 F.2d 416 (4th Cir.1986), cited by Plaintiff. Here T & T terminated Corsearch's permission to resell in accordance with the terms of the dispensation given, whereas in *Wood Processors* the plaintiff's termination constituted a breach of contract. *See id.* at 429.[16] The Court rejects Plaintiff's argument that the defense of copyright is unavailable to Defendant on the basis that T & T achieved its monopoly the trademark search market by acquiring all of the copyrights relevant to that market. *Cf. United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir.1981). T & T's copy-

---

**16.** Furthermore, *Wood Processors* involved a § 1 violation in which the patent holder had acquired its rights under the patent as part of a horizontal conspiracy to eliminate outstanding licenses and then, acting in concert with a competing licensee, terminated the plaintiff's license. *See id.* Similarly, *Mannington Mills v. Congoleum Industries*, 610 F.2d 1059 (3d Cir. 1979), also cited by Plaintiff, involved a § 1 claim that a manufacturer holding patents for embossed vinyl products had conspired with one or more of its foreign licensees to cancel the plaintiff's foreign sales licenses after the foreign licensees had complained about the plaintiff's excessive competition and had threatened to terminate their own licenses. *Id.* at 1069–70. The instant case involves T & T's unilateral termination of Corsearch's license, pursuant to the agreement between the parties and not in concert with any licensed competitors of Corsearch.

right extends to its particular enhancements to a preexisting body of material that is still available from each state. Under the facts found above, T & T's copyright prevents neither Corsearch nor any other competitor from creating its own state trademark database and thereby entering the relevant submarket.

Although the rationale of *Miller Insituform* should govern this issue, Corsearch argues that under antitrust precedent, T & T may not refuse to deal with Corsearch by terminating Corsearch's use of TS–State without a valid business justification. In support of this contention, Corsearch cites *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); and *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

The Supreme Court in *Eastman Kodak* did address "the question whether the defendant's refusal to sell its goods to the plaintiff at dealers' discounts was in furtherance of a purpose to monopolize and constituted an actionable wrong." 273 U.S. at 375, 47 S.Ct. at 404. However, the Court merely found that "the circumstances disclosed in the evidence sufficiently tended to indicate such purpose [to monopolize], as a matter of just and reasonable inference, to warrant the submission of this question to the jury" and concluded that the question was submitted under proper instructions. *Id.*

In citing *Berkey Photo*, Corsearch quotes from the court's general discussion of § 2 of the Sherman Act, in which the court stated that "[e]ven if the origin of the monopoly power was innocent, ... the *Grinnell* rule recognizes that maintaining or extending market control by the exercise of that power is sufficient to complete a violation of § 2." 603 F.2d at 274. The court in *Berkey Photo* did address the district court's granting of equitable relief on a § 2 claim, where plaintiff alleged, *inter alia,* that defendant had used its control

over other markets to disadvantage competitors in the photofinishing market. The court noted that, "[g]iven Kodak's monopoly power in color paper, this refusal to deal would, unless justified by a valid business reason, appear to violate § 2 and form the basis for a grant of equitable relief." *Id.* at 292.

In *Aspen,* the Supreme Court upheld a jury's determination that the owner of three ski resorts abused its monopoly power and violated § 2 of the Sherman Act in discontinuing participation by a fourth ski resort in a jointly offered interchangeable lift ticket program. The fact pattern in Aspen, however, is not consistent with the fact pattern here. In *Aspen* the competitors were true competitors, each owning exclusive rights to scarce resources, i.e. its own ski facilities on its own mountain. These true competitors entered into a joint marketing arrangement for mutual benefit which over the years had become a pattern of distribution. After several years the monopolist owner of three of the ski facilities cancelled the joint marketing arrangement, disadvantaging the fourth ski facility and depriving the user of equal access to all four facilities, but continuing a three-member joint marketing arrangement. Although the Court found that such a decision was not necessarily anti-competitive, 472 U.S. at 604, 105 S.Ct. at 2858, it determined that there were adequate grounds for the jury's determination that there was no valid business reason for the defendant's refusal to deal.

In this case, however, Mr. Becker, the president of T & T and a witness of good credibility, did articulate during cross examination valid business reasons for termination of Corsearch and other resellers, thus meeting the test applied in *Berkey* and *Aspen.* Those valid business reasons can be summarized as follows. In offering its new product TS–Federal, T & T had contemplated that its customers would have the alternatives of using the on-line services for knock-out or preliminary searches or of going to the source of those copyrighted services, T & T, for its other product, a full trademark search and exhaustive report. Tr. 1403–09 (Becker).

Coincidentally, T & T permitted its distribution channel to be intercepted by resellers, apparently because it had been advised that its co-exclusive license with the PTO required such permission with respect to T & T's federal database. Becker Aff., ¶¶ 24, 40; Tr. 1357–58 (Becker). Later, T & T offered its customers TS–State based on a similar marketing strategy.

The marketing strategy for T & T's original on-line service entitled Trademarkscan, later renamed Trademarkscan–Federal, is reflected in Dialog's "Blue Sheets," which state that the database was "designed primarily as a fast screening tool for checking the availability of new product or service names." Pl. Exh. 260. According to Becker, the later product Trademarkscan–State was designed for the same purpose, although its file description in Dialog's "Blue Sheets" does not contain a similar explanation. Pl. Exh. 262. Becker testified that it was his concern that the end user, when purchasing from resellers of TS–State or TS–Federal, rather than receiving T & T's product differentiation advice on line through Dialog (and through T & T's marketing pieces and price lists) would receive T & T's product, together with other search information, without T & T's product differentiation advice. Tr. 1409–16 (Becker).[17] Such a differentiation of products on its face constitutes a valid marketing strategy, which Corsearch has not demonstrated to be invalid by a preponderance of the evidence.

The *Aspen* Court stated that whether the defendant's conduct could properly be characterized as exclusionary could not be answered simply by considering its effect on competitors:

In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory. It is, accordingly, appropriate to examine the effect of the challenged pattern of conduct on consumers, on Ski Co.'s smaller rival, and on Ski Co. itself.

*Id.* at 605, 105 S.Ct. at 2859 (footnotes omitted).

An examination of the effect on consumers should consider both long term and short term effects. Corsearch until recently was not a true competitor using an independent source for the state trademark information that it offered to the end user. Instead, it had taken advantage of a business opportunity created by (1) the on-line offering of information by the Defendant, a service that had been intended for the benefit of the end users of that information; (2) Defendant's pricing policies for on-line use and for comprehensive trademark search reports; and (3) Defendant's specific waiver of its limitation on resale of that copyrighted material. The only benefits to consumers from the Plaintiff's competition were speed of service and, possibly, attractiveness of packaging and convenience. There was no true price benefit to the consumer because Plaintiff was not in a position to engage in full competition. To stay in business, Plaintiff had to provide a profit to the creator and make a profit itself. For consumers, the preferable mode of competition, as Corsearch's president Mr. Frank testified, is that competitors each independently originate and produce products meeting the consumers' requirements. The Plaintiff's consumer witnesses have testified that they preferred the Corsearch service and product to T & T's and that Corsearch's impact on speed, service, and product desirability has beneficially affected the comprehensive trademark research reports offered by T & T. In the short term, the effect of T & T's termination on the consumer will be undesirable since some desirable elements of Corsearch's competition will be lost, but in the long term T & T's termination will have a desirable effect if Corsearch develops its own state database, as the Court finds it could afford to do, since then competition

---

**17.** He also felt that Corsearch's reselling of TS–State data in reports sold as full search reports constituted free-riding by Corsearch on T & T's investment of work and capital. Tr. 1419 (Becker).

will exist in servicing and packaging and, most importantly, in price.

The third element examined in *Aspen*, plaintiff's ability to compete, *see id.* at 607–08, 105 S.Ct. at 2859–60, has been discussed here in connection with "barriers to entry" but is further explicated by T & T's offers to Corsearch after the complaint was filed and prior to trial and the effective date of termination, as are described below.

Recognizing that time and cost could be a barrier to Corsearch's developing its own state trademark database, on November 1, 1991, approximately thirty days before the scheduled termination date, T & T made a first unconditional offer[18] to grant Corsearch a perpetual right to T & T's state database for a fee of $750,000, to be paid in thirty-six equal monthly installments over three years. T & T would turn over to Corsearch in January 1993 the entire state trademark database as it exists on December 31, 1992. The offer prohibited Corsearch from selling or licensing the contents of the database to third-parties except in connection with the sale of trademark search reports and other normal business operations of Corsearch. Def. Exh. Z; Tr. 411, 454 (Shklar); 1349 (Becker). During the three-year period Corsearch would also be given the right to resell reports generated by TS–State for a fee of $150,000 or fifty percent of Corsearch's Dialog on-line charges, whichever was greater. The projected amount Corsearch was expected to spend on TS–State for 1991 was $328,666. Tr. 1870 (Frank). Thus, acquisition of the database and interim rights to resell would have cost Corsearch approximately $414,000 for each of the next three years but thereafter would have cost Corsearch nothing. After November 1994 Corsearch's Dialog on-line charges for TS–State would be eliminated. Based on Corsearch's financial projections for 1991, it was possible for it to finance these costs.

Corsearch rejected the offer in a letter dated November 7, 1991. Def. Exh. AA. Corsearch's president, Mr. Frank, testified at his deposition that T & T's offer was rejected because his "intuition" told him the price was too high. Frank Dep., p. 65 l. 6 to p. 66 l. 11; Tr. 1880 (Frank). At trial, Mr. Frank testified that he did *not* know whether T & T's November 1, 1991, offer was too high and that the offer was *not* rejected because it was too costly. Tr. 1877–78 (Frank).

On November 15, 1991 T & T modified unconditionally its November 1, 1991 offer by reducing the fee of $750,000 to be paid over three years to a fee of $650,000 to be paid in sixty equal monthly installments, $130,000 a year. Def. Exh. III. It also provided that Corsearch could sell or license the contents of the database through on-line access or CD–ROMs after November 1996. Assuming that Corsearch's costs for Dialog on-line use of TS–State continued at $328,666 as projected for 1991, costs to Corsearch of acquiring the database plus interim rights to resell would have been approximately $294,000 per year for three years, and $130,000 per year in the fourth and fifth years. After the third year, Corsearch would save an estimated $328,666 per year because with the database in its possession Corsearch would no longer be using TS–State on line for its state trademark searching. Def. Exhs. Z, WWW, and III; Tr. 1870–80 (Frank). Corsearch could have afforded to make these payments.

Mr. Shklar, Corsearch's vice president, testified that Corsearch turned down the unconditional offer by T & T of a perpetual license to T & T's database because Corsearch preferred to build its own database, Tr. 492 (Shklar), and because Corsearch believed that it may be able to build its own database for less than the price being requested by T & T for a perpetual license. Tr. 493 (Shklar). Corsearch also recognized that building its own state database would enhance competition in the trademark information industry. Tr. 492, 495 (Shklar); *cf.* Tr. 1333 (Becker). Mr. Frank testified that if the preparation of a state trademark database would cost close to

---

18. The offer was "unconditional" in the sense that discontinuance of the litigation was not a condition. The offer was clearly made unconditional on November 6, 1991 at a court conference. Tr. 452 (Shklar).

$750,000, "I would rather put it up myself and try to create a better database than [T & T's]." Tr. 1840 (Frank). Mr. Shklar also testified that one of Mr. Frank's reasons for rejecting the offer for a perpetual license was because he believed that Corsearch could build a better database and that a better database would enable Corsearch "to compete better with Thomson & Thomson." Tr. 491–92 (Shklar).

Corsearch could have afforded to accept either of T & T's offers. The payments to T & T would have been less than half of Corsearch's projected operating profits for 1991 and 1992. Def. Exhs. YY and WWW; Tr. 1870–80 (Frank). The payments as a function of Corsearch's operating profits would have been lower after three years (or non-existent in the case of the November 1 offer). If it had accepted either offer, Corsearch could reasonably expect that its operating profits would have increased after three years because it would no longer be incurring on-line charges for state database information.

In view of the foregoing, the Court finds that, although the termination by T & T of Corsearch's right to resell TS–State was done to prevent Corsearch from competing with T & T by use of TS–State, it was a valid act of an owner of a copyright to protect its marketing strategy, which differentiated its copyrighted on-line material from its comprehensive search reports. The termination was not done to exclude Corsearch from competing with T & T in the comprehensive trademark search report submarket, but to protect the non-differentiation of the scope of T & T's copyrighted product from the scope of a full search of T & T's internal database. T & T was entitled to protect its products in this manner, due to its long-term development and assemblage of trademark information.

### ATTEMPTED MONOPOLIZATION

■ To succeed on its attempted monopolization claim, Corsearch was required to prove that T & T "(1) intended to monopolize the [comprehensive trademark search] market; (2) engaged in conduct designed to carry out that intent; and (3) had a 'dangerous probability' of success." *Twin Lab.*

*v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir.1990) (quoting *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953)). The first two elements have not been met, since this Court has found that T & T did not intend to monopolize the comprehensive trademark search market and that its actions were not designed to carry out such an intent, but rather were undertaken for valid business reasons. Therefore, Corsearch's attempted monopoly claim has not been proved.

### ESSENTIAL FACILITY

■ Plaintiff's essential facilities count asserts that § 2 of the Sherman Act imposes a duty on T & T to make available to Corsearch its TS–State on-line service, at least until Corsearch can develop its own state database. Corsearch, however, has not proved that TS–State is an essential facility. To succeed on this count, "[a]t the very least, [Corsearch] must demonstrate that 'duplication of the facility would be economically infeasible' and that 'denial of its use inflicts a *severe handicap* on potential [or current] market entrants.'" *Twin Lab.*, 900 F.2d at 568 (emphasis in original) (quoting *Hecht v. Pro–Football*, 570 F.2d 982, 992 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978)).

In view of Corsearch's existing computer software experience and the general advances in modern computer technology, it seems clear that, contrary to the allegations in the complaint (¶¶ 3, 5), a state database could have been built by Corsearch in less than a year of its receipt of the termination note at a price Corsearch and other potential entrants into the comprehensive trademark search report market could afford. Gevers Aff., ¶¶ 6–9, 12–13; Tr. 381–82, 474, 492–93 (Shklar), 688 (Frank); *see also* Tr. 1840 (Frank).

The data contained in the TS–State database is not a scarce resource, as it is readily available from the fifty states. This Court has found that it would not be economically infeasible for Corsearch to develop its own state database or to have pur-

chased that database pursuant to T & T's offers. Corsearch has not been prevented from creating its own state database and thereby becoming a strong and independent competitor to T & T in the comprehensive search market.[19]

## T & T'S UNCLEAN HANDS DEFENSE

Because the Court finds that no antitrust violation occurred, it does not reach the question whether the defense of unclean hands is viable in an antitrust action where equitable relief is sought.

## JURISDICTION OVER COUNTERCLAIMS [20]

■ Corsearch argues that T & T's state law counterclaims of breach of contract, fraud, and unfair competition are permissive counterclaims with no independent jurisdictional basis. T & T argues that its counterclaims are within the Court's jurisdiction because they are compulsory counterclaims within the definition of Fed.R.Civ.P. 13(a).

The traditional principles of pendent and ancillary jurisdiction were codified in the Judicial Improvements Act of 1990, 28 U.S.C. § 1367. *See* 28 U.S.C.A. § 1367, Practice Commentary (West Supp.1991). Under those principles and § 1367, this court has supplemental jurisdiction over T & T's counterclaims. Although, strictly speaking, T & T's termination of Corsearch's permission to resell output from the TS–State on-line database is a separate transaction from Corsearch's alleged fraudulent obtainment of the CD–ROM, the factual context surrounding each is overlapping. *See Crouse–Hinds Co. v. Inter-North, Inc.*, 634 F.2d 690 (2d Cir.1980) ("transaction" is flexible concept; district court properly asserted jurisdiction over two claims with "clear logical relationship and an adequate factual overlap to warrant classification of the counterclaim as compulsory") (citing *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926)). In ruling on Counts II, III, IV, and VI, this Court has made findings concerning Corsearch's procuring and using T & T's CD–ROM without authorization. The CD–ROM contains virtually the identical data available on line from Dialog. Corsearch's temporary possession and use of the CD–ROM was discussed in connection with Corsearch's use of TS–State on line in Corsearch's draft Business Plan for 1992.

Moreover, as Plaintiff admits, Tr. 6, allegations concerning T & T's refusal to allow resellers to purchase the CD–ROM were made in Count I, which alleged concerted refusal to deal in violation of § 1 of the Sherman Act. It is immaterial to the question of this Court's jurisdiction that these counts were dropped prior to trial. T & T's answer with counterclaims was served after the Court acquired jurisdiction due to the filing of Plaintiff's complaint. *See Koufakis v. Carvel*, 425 F.2d 892, 900 (2d Cir.1970) ("It is well settled that the jurisdiction of the federal district courts, once acquired in cases similar to the present one, does not necessarily fail due to subsequent actions by the parties such as amendment of the pleadings to drop all claims of trademark infringement." (citing *Hazel Bishop, Inc. v. Perfemme, Inc.*, 314 F.2d 399, 402–04 (2d Cir.1963)).

## CONCLUSION

For the foregoing reasons, judgment will be entered for the Defendant on Counts II, III, IV, and VI of the complaint. Counsel

---

19. The relative ease of entry into the comprehensive trademark search market distinguishes this case from *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), cited by Plaintiffs. *Otter Tail* involved an electric utility company that sold electric power at retail in towns in which it operated under municipally granted franchises for limited time periods. Each town in Otter Tail's service area generally could accommodate only one distribution system, making each town a natural monopoly market for the distribution and sale of electric power at retail. The antitrust charge against Otter Tail involved its methods of preventing the towns it served from establishing their own municipal systems when Otter Tail's franchises expired. Here, T & T has no natural monopoly over the state data contained in TS–State.

20. In accordance with Plaintiff's request in the pretrial order, T & T's four counterclaims in its First Amended Answer with Counterclaims are severed and will be tried separately.

**334**

are to attend a conference in courtroom 302 at 9:00 a.m. on May 26, 1992, to schedule the trial of the remaining issues in this case.

IT IS SO ORDERED.