INTERNATIONAL STAR CLASS YACHT RACING ASSOCIATION, Plaintiff,

v.

TOMMY HILFIGER U.S.A., INC., Defendant.

No. 94 Civil 2663 (RPP).

United States District Court, S.D. New York.

March 4, 1997.

Ross & Hardies, New York City, by J. Joseph Bainton, John G. McCarthy, Chike I. Chukwulozie, for Plaintiff.

Cowan, Liebowitz & Latman, P.C., New York City, by Louis S. Ederer, Joseph H. Lessem, for Defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

On April 4, 1996 the Second Circuit affirmed in part, vacated in part, and remanded the judgment this Court entered on May 19, 1995. The Second Circuit found that the District Court's conclusion that there was no evidence of bad faith or wilful infringement in defendant Tommy Hilfiger, U.S.A., Inc.'s ("Hilfiger") use of the "Star Class" marks was based on two erroneous factual findings: (1) that the trademark search that defendant undertook was of both federal and state marks, when in fact it was of federal marks only, see *International Star Class Yacht Racing Association v. Hilfiger*, 80 F.3d 749, 752 (2d Cir.1996); and, (2) that although Hilfiger intentionally copied plaintiff International Star Class Yacht Racing Association's ("ISCYRA") "Star Class" mark, it did not intend to copy a trademark owned by another. Id. at 753. The Second Circuit found this to be clearly erroneous given Hilfiger's minimal efforts to ascertain whether "Star Class" was a trademark. *Id.*

The Second Circuit also found that the District Court's analysis of Hilfiger's bad faith was incomplete, as the District Court did not address Hilfiger's failure to conduct a full trademark search on Star Class "in direct contravention of the advice of its attorneys," *id.* at 754, and did not take into consideration Hilfiger's continued sale of allegedly infringing merchandise after initiation of this suit. *Id.*

On remand, the defendant moved to present additional evidence on the issue of its alleged bad faith and the amount of damages to be imposed, based on the Second Circuit's statement that after plaintiff instituted this action Hilfiger continued to utilize plaintiff's mark on its apparel, "racking up over $3 million in sales". *Id.*

The District Court granted defendant's motion and allowed the presentation of additional evidence on October 24, 1996. The evidence consisted of the testimony of Steven R. Gursky ("Gursky"), counsel to defendant, whose testimony was designed to rebut the Second Circuit's statement that defendant ignored the advice of his firm in its use of the "Star Class" mark. Also, a witness from Hilfiger's controllers' office presented records showing defendant shipped only $818,-492.85 worth of goods bearing the words "Star Class" after the commencement of the action (Transcript of October 24, 1996 Hearing, "Hearing Tr." at 557–60), not the "over $3 million in sales" stated by the Circuit Court.

The Court rejects *in toto* the testimony of Gursky at the October 24, 1996 hearing. Defense counsel had adequate notice at trial of the plaintiff's claim of bad faith and made a record at trial as to the advice defendant received from its counsel on the use of "Star Class". Contrary to defendant's contention in its Post–Trial Memorandum of Law on Remand ("Post–Trial Mem." at 2–3 n. 1) requesting the evidentiary hearing, prior to trial the plaintiff did raise the issue of the defendant's bad faith, albeit in a less direct fashion than suggested by the Second Circuit. The plaintiff's complaint filed on April 13, 1994 charged a violation of the Lanham Act, which should have alerted defense counsel to the probability of a claim of bad faith, a factor considered under Lanham Act analysis. See *Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 584 (2d Cir.1993). Also, in its Memorandum in Support of Its Motion For a Preliminary Injunction ("Mem. in Supp. of Prelim. Inj.") filed with the complaint, in sections entitled "Defendant's Bad Faith" (Mem. in Supp. of Prelim. Inj. at 16) and "Predatory Intent" (*Id.* at 21), as well as in its Memorandum Opposing Summary Judgment, plaintiff disputed defendant's claim of no evidence of intentional copying. Similarly plaintiff leveled charges in the Pre–Trial Order of "wilful and deliberate" copying and "deception", and in its Proposed Findings of Fact and Conclusions of Law, plaintiff charged Hilfiger acted with predatory intent. All of these statements should have put defendant's counsel on notice that at trial plaintiff would be charging bad faith. The fact that defen-

dant's counsel did not realize at trial that plaintiff was offering evidence which could show bad faith is irrelevant. Defendant's counsel had an opportunity to counter such claims with proof from the defendant's executives as to their state of mind in utilizing the mark "Star Class" and chose not to do so, but to rely instead on counter-designations in the deposition testimony of defendant's director of design Michael Sondag ("Sondag")[1] to the effect that he did not know that the Star Class existed as a class of racing yachts. (Transcript of Trial of January 9, 10, 1995, "Trial Tr." at 233–34.) The defense also called Neil Burstein ("Burstein"), of counsel on intellectual property matters to the law firm representing defendant and an adviser to defendant in this matter, to show that the defendant had proceeded to use "Star Class" only after its attorneys had conducted two trademark screening searches. The fact that defendant employed counsel with insufficient trial experience is no excuse for its failure to call additional witnesses.

Accordingly, the evidence presented at the trial is the sole basis on which plaintiff's bad faith claim should be evaluated, and only the evidence at trial (not the evidence at the October 24, 1996 hearing) will be reconsidered in light of the Second Circuit's opinion.

### Discussion

In its Findings of Fact and Conclusions of Law, this Court did commit a clear mistake in finding that a trademark search of federal and state registrations had been conducted by the defendant, as opposed to just a federal trademark search.[2] The Court's recollection of the nature of the "knock-out" trademark search conducted for the defendant was clearly incorrect, but this error is not one of any moment, as a state trademark search would not have revealed any trademark of plaintiff's (Plaintiff's Exhibit, "Pl.Ex." 79),[3]

and so this error by the Court does not bear on the issue of defendant's bad faith.

The Second Circuit's suggestion that, in light of Hilfiger's minimal efforts to ascertain whether "Star Class" was in fact a trademark, this Court erred in finding Hilfiger guilty only of simple copying and not intent to copy a mark, does not take into account the change in industry practice in trademark searches that took place in the late 1980s and early 1990s of which the District Court was aware.

*Corsearch v. Thomson & Thomson,* 792 F.Supp. 305 (S.D.N.Y.1992), an antitrust case, was tried before this Judge over a period of about four weeks in late 1991. In that case it was uncontested that after the fall of 1989 industry practice in trademark searches underwent a significant metamorphosis following the general release by the federal patent and trademark office of its computerized data base of all federally registered marks and pending applications. *See Corsearch v. Thomson & Thomson,* 792 F.Supp. at 308, 323–25. Thereafter, several firms, including Corsearch, Mead Data Central and Dun & Bradstreet, entered the trademark screening search field in competition with Thomson & Thomson which had held "monopoly power in the 'comprehensive trademark search market' " and had had an exclusive right, as had Trademark Research Corporation, to license the computerized version of the federal trademark search which they helped develop. *Id.* at 308. Testimony in *Corsearch* revealed that a number of "trademark search firms" now offer only screening searches of the federal data base, *id.* at 323, and that such firms are widely used by in-house and trademark counsel to conduct "knock-out" or "rule out" searches of names and symbols, and comprehensive or "more sophisticated searches are reserved for marks which have passed knock out tests and are being seriously considered for trade-

---

1. Sondag reported directly to Tommy Hilfiger. (Trial Tr. at 227.)

2. Two trademark search companies, Thomson & Thomson, through Dialog Information Services, Inc., and Trademark Research Corporation, did offer both federal and state trademark screening searches for all fifty states at the time. *See*

*Corsearch v. Thomson & Thomson,* 792 F.Supp. 305, 307 (S.D.N.Y.1992)(discussed *infra* ).

3. A full search performed after the initiation of this lawsuit by Thomson & Thomson revealed only common law trademark use by plaintiff. (Transcript of January 9, 10, 1995 Trial, "Trial Tr." at 317; Pl.Ex. 79.)

mark registration." *Id.* at 311 (quoting Affirmation of Dr. Marion Stewart ¶¶ 21–22).

Indeed, industry statistics demonstrated that a multitude of federal trademark applications are regularly filed without a full search being conducted.[4] *Id.* at 307. It was thus common practice for businesses to use trademarks and apply for federal registration without conducting a full trademark search and to rely instead on computerized screening searches, or "knock-out" searches, comprised only of federal trademarks and pending applications, before such use and registration. *Id.* at 307.

Indeed, the Court has been unable to find any case prior to the Second Circuit decision which has held that a party in Hilfiger's position had a duty to conduct a full search of prior uses of a trademark before use, and has only found two explicitly requiring the search for existing registered marks. *See Sands, Taylor & Wood. Co. v. Quaker Oats, Co.,* 978 F.2d 947 (7th Cir.1992) *cert. denied,* 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993) (*aff'g* 1990 WL 251914 at * 20 (N.D.Ill. Dec.20, 1990)); *see also Zazú Designs v. L'Oreal,* 979 F.2d 499, 504 (7th Cir.1992) ("Firms need only search the register before embarking on development."); *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70 (2nd Cir. 1988) (upholding lower court finding that search limited to only registered marks was not bad faith). Court opinions such as these, although principally dicta, evidently were relied upon in business and by trademark counsel, especially by those anxious not to maximize their costs with full searches and anxious not to delay production while a comprehensive search was conducted.

In light of the common practice in the industry as revealed in *Corsearch* and supported by the case law, defendant's efforts to ascertain whether "Star Class" was a mark of another do not appear to be inadequate. Moreover, defendant's conduct does not appear in any other way to evince an intent to copy the mark of another. There is no question Hilfiger advertised the Nantucket Line as "combining classic nautical sportswear with a variety of authentic details taken from the sport of competitive sailing." (Trial Tr. at 34, 229.) There was no evidence, however, that Hilfiger had reason to believe that the designation "Star Class" was anything other than a certain type of sailboat used in racing. Hilfiger's designer admitted examining *Stars and Stripes: The Official Record,* a coffee table book published by Dennis Connor Sports, a recognized authority on sailboat racing (Pl.Ex. 88; Trial Tr. at 230), which referred to Star Class racing and Star Class boats but gave no indication of the affiliation of that phrase with ISCRYA, and treated the phrase generically on many of its pages. *See International Star Class Yacht Racing Association v. Tommy Hilfiger U.S.A., Inc.,* 1995 WL 241875 at * 7 (S.D.N.Y. April 26, 1995). Designer Sondag stated that he had not determined that Star Class as a class of sailing yachts existed.[5] (Trial Tr. at 233–34.) There was no showing that the defendant knew ISCRYA existed. Even Burstein, who was a member of a yacht club, testified he had no such knowledge (*Id.* at 330, 339), and plaintiff offered no evidence anyone else at Hilfiger had such knowledge.

Counsel for plaintiff's reliance on the testimony of designer Sondag (a layperson) to the effect that he copied another logo, to show

---

**4.** As the *Corsearch* opinion stated:
   [T]housands of federal trademark applications are filed each year without ordering a full search from any trademark information service.. Corsearch and [Thomson & Thomson] combined performed only approximately 60,-000 comprehensive searches in 1990, a substantial number of which did not result in trademark applications. 127,000 trademark applications were filed with the [United States Patent and Trademark Office] in 1990. *Corsearch,* 792 F.Supp. at 307.

**5.** In view of Sondag's testimony, the Court does not find that defendant's failure to call Tommy

Hilfiger, Sondag's immediate supervisor, warrants drawing an adverse inference that Mr. Hilfiger's testimony would have been unfavorable to defendant. There was no showing that Mr. Hilfiger's testimony would not "merely have repeated other testimony and evidence already before" the Court through Sondag's deposition, and so an adverse inference would be inappropriate. *See* 3 Leonard B. Sand *et al., Modern Federal Jury Instructions* ¶ 75.01 (Instruction 75–3) (1996). Counsel advised that all of defendant's executives were unavailable as it was "market week" in the industry. (Trial Tr. at 223.)

predatory intent to copy the mark of another, is almost laughable. (*Id.* at 239 (quoting Sondag Deposition).) The North Sails logo discussed in the designer's testimony consists of a round circle with a slash mark separating the letters "N" and "S". (*Id.* at 35.) Use of a round circle with a slash mark separating letters or distinctive symbols is a very common trademark design. Hilfiger used the round circle with a double slash mark to enclose and separate the letters "T" and "H" (*Id.* at 35–37), and the double slash mark incorporated the word "HILFIGER".[6] (*See* Def. Ex. 40 (attached as Ex. A).) The letters "N" and "S" do not resemble "T" and "H", and the mark may not be considered a "copy" as a matter of law, despite the witness's use of the vernacular. There is no evidence that this action of Hilfiger's evinced an intent to copy the mark of another.

As the Second Circuit stated, the fact that Hilfiger went ahead with the use of the phrase "Star Class" after receiving defendant's counsel's letter of August 6, 1993 to Hilfiger trademark liaison Kathleen Luparello ("Luparello") must be considered in evaluating Hilfiger's bad faith. (Letter of Gursky & Blau to Luparello of August 6,, 1993, Pl. Ex. 74.) Prior to sending the letter, defendant's counsel had performed a trademark screening search by computer of federal trademark registrations and pending applications for the trade names "Star Class" and "Haberdasher". (Pl.Ex. 72.)[7] It advised its client in the letter of August 6, 1993 against the use of the trade name "Haberdasher" because of prior use. (Pl.Ex. 74.) With respect to "Star Class" it advised:

> The screening search for the mark STAR CLASS did not reveal any identical federal trademark registrations or applications in class 25 which would bar your proposed use of this mark. At this point, we would not necessarily rule out your use

and registration of this mark *subject to our usual disclaimers regarding the need to first obtain and review a full trademark search.* Also to be considered is the fact that STAR CLASS would be a rather weak trademark. This is because the words "STAR" and "CLASS" are non-distinctive terms used extensively in other fields by third parties.

> Please do not hesitate to call me directly if you have any questions about the screening search. If you want to proceed with a full search for STAR CLASS, please advise.

(Pl.Ex. 74)(emphasis in text).

Defendant's reaction to this letter must be considered in light of the growing use of knock-out searches and the greatly reduced use of full searches by businesses and law firms after 1989. *See. e.g., Corsearch v. Thomson & Thomson,* 792 F.Supp. at 307, 321 (Thomson & Thomson's revenues from full searches dropped from ninety-five percent to sixty percent of total revenues between 1983 and 1991). In light of this custom and practice in the trademark search field, the underlined section in the letter need not be interpreted as advice to conduct a comprehensive trademark search before any use of "Star Class" but more as a "cover your backside" lawyer's disclaimer of responsibility, intended to protect the lawyer in the event of adverse consequences from the adoption of the mark, rather than to advise the client to conduct a full search before using and registering[8] "Star Class" as a trademark. Indeed, Luparello, in the pretrial deposition read into the record by plaintiff's attorney, testified she regarded the disclaimer language as "attorney paranoia". (Trial Tr. at 354 (quoting Luparello Deposition).) At trial, Burstein, the author of the

---

6. The numbers "0" and "42" were added within the circle, the latter designating Mr. Hilfiger's age. (Trial Tr. at 240 (quoting Sondag Deposition).)

7. In fact, two screening searches were performed on Westlaw on August 3, 1993. Plaintiff's Exhibit 72 covered all federal registered and pending applications for "Star" and "Class" (Trial Tr. at 307–8), and Plaintiff's Exhibit 73 covered "Star

Class" for International Class 25 (clothing) and U.S. Class 39 (clothing). (Trial Tr. at 324–36.)

8. In order for rights to be perfected in a registered trademark, both use and registration must be shown. *See* Anne C. Hiaring, "Principles of Trademark Law" in *Understanding Basic Trademark Law* 1996, at 9, 16–17 (PLI Pat., Copyrights, Trademarks, and Literary Prop. Course Handbook Series No. G–451, 1996).

letter, explained the disclaimer as follows during cross-examination:

> Q: ... Would you please tell me ... what the "usual disclaimers" regarding a need to first obtain and review a full trademark search were?
>
> A: Well, generally before a mark is used and registered as a stand alone mark, we recommend that a full trademark search be conducted. It's pretty much the gist of the disclaimers.

(Trial Tr. at 327.)

Here, Star Class was not used as a "stand alone mark" by Hilfiger to identify the source of goods or to identify a line of goods, nor was it intended to be "used and registered". The T/H circle symbol, which contains the name "HILFIGER" in good-sized type, was used for decoration, evidently to give the goods "panache". Another decorative symbol used in a similar manner was a decorated crest bearing the word "NANTUCKET", under which were two small flags, one of which contained "T ★ H". The decoration which gave rise to this suit was a yacht club-type pennant bearing the initials "TH" and the number 42 (Hilfiger's age), capped by the words "TOMMY HILFIGER" in large letters and underlined by the words "STAR ★ CLASS" in slightly smaller letters. On the left side of the pennant was the notation "EST.", and on the right, "MCMLXXXV". The most logical interpretation of this decoration was that the product was from Hilfiger's best class of products. The name "Star Class" was not registered or attempted to be registered by Hilfiger, and the words were not for use to designate a class of goods. The line of goods was called the "Nantucket Line", and Hilfiger prominently displayed its stand-alone mark, the name "Tommy Hilfiger", in large letters on the outside surface of its goods in addition to labeling them inside the collar. If the mark was not intended to be "used and registered as a stand alone mark", then, according to Burstein's testimony, there was no reason for Hilfiger to order its law firm to undertake a full search.

Burstein's trial testimony supports the conclusion that his letter was not intended to advise Hilfiger to have a full search done before using "Star Class" unless it was to be used as a "stand alone mark". While Burstein's testimony as to the meaning of his firm's disclaimer represents more conservative advice than industry practice in late 1991 and, inferentially, in 1993, since full searches were no longer ordered as a matter of course even when a mark was intended to be used and registered, that advice is not inconsistent with industry practice when the mark was not intended to be used and registered and only used for decoration. Thus, since Hilfiger was only using "Star Class" as a decoration and not as a trademark, its subsequent use of "Star Class" without ordering a full search is not inconsistent with its attorney's advice and was consistent with a common industry practice.

With respect to the issue of whether defendant's bad faith is evidenced by its continued sale of the clothes that bore the words "Star Class" after the filing of this lawsuit, the continued sale is consistent with the defendant's attorneys' opinion in the letter of August 6, 1993 (Pl.Ex. 74) that plaintiff's nonregistered mark was "rather weak". Indeed, the Thomson & Thomson search had revealed that federal registered marks for "Star Class" existed for use on paper goods and printed matter, as well as for interiors, and that an application for "Star Classics" was then pending covering toys and sporting goods (Trial Tr. at 314), and "Star Class" was registered for advertising and business services in Pennsylvania. (Pl.Ex. 79.) As Burstein testified, the comprehensive trademark search had revealed widespread use of "Star" and "Class" by others and evidenced no use of "Star Class" by plaintiff with respect to apparel but only with respect to yacht club membership. (Id. at 317.) Plaintiff did not undertake a consumer survey to show that ISCRYA or its mark were widely known to persons interested in purchasing sportswear with a nautical ambiance. *See Hilfiger I* 1995 WL 241875 at * 8. No evidence showed that the defendant acted with the aim of securing customers who were customers or members of plaintiff's organization,[9] or that

---

9. Defense witness Allan Zwerner, Senior Vice

President of Burdine's, a Miami department

the conduct of defendant was an attempt to engage in deceptive commercial practices. *See id.* at *11. As the Court's Conclusions of Law reveal, the issue of whether the term "Star Class" was generic or was descriptive and had acquired secondary meaning was a close question. *See id.* at *4–*9. The Court does not find bad faith based on defendant's continued distribution of already manufactured goods following the receipt of plaintiff's notice of trademark claim letter and the initiation of this action. There is no evidence or suggestion that defendant's attorneys suggested that such distribution and sale be discontinued.

Accordingly, the Court finds the plaintiff did not prove defendant's bad faith in its use of "Star Class" on its garments offered for sale prior to this Court's decision, and denies plaintiff's request for an accounting of Hilfiger's profits. Plaintiff's request for an award of attorneys' fees is denied as well.[10]

Since the Circuit may not agree with this Court's finding that plaintiff offered insufficient evidence of defendant's bad faith, the Court will make findings on the evidence of damages. As shown by Defendant's Exhibit 45 (Hearing Tr. at 438–45), the defendant shipped only $818,419.85 worth of goods

bearing the phrase "Star Class" after March 31, 1994, two weeks after plaintiff's cease and desist letter dated March 16, 1994 (Plaintiff's Revised Post–Trial Brief at 23) and two weeks before the filing of this lawsuit. Defendant offered no evidence of its costs attributable to these sales. Accordingly, no deduction will be made for such costs. See 15 U.S.C. § 1117; see also *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir.1985).

### *Conclusion*

For the reasons stated above, plaintiff has not shown by a preponderance of the evidence that defendant acted in bad faith in using plaintiff's trademark. Accordingly, plaintiff's request for an accounting of defendant's profits or an order that defendant pay attorneys' fees is denied.

In any event, plaintiff has not shown damages of more than $818,419.85. No evidence has been offered as to the attorneys' fees incurred by plaintiff in this action, so no determination of fees can be made at this time.

IT IS SO ORDERED.

---

store chain, testified that although Burdine's purchased $24.5 million worth of defendant's products in 1994 for 40 retail stores, it never received any inquiries as to possible sponsorship or affiliation with plaintiff. (Trial Tr. at 254–66); *see Hilfiger*, 1995 WL 241875 at * 12.

**10.** No evidence has been offered as to the attor-

neys' fees plaintiff incurred in this action.